Lawrence E. NEWBILL, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 79A02–0705–CR–433.**

Court of Appeals of Indiana.

April 16, 2008.

Transfer Denied June 19, 2008.

---

386

Elizabeth B. Searle, Ball Eggleston PC, Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Lawrence E. Newbill appeals his conviction, after a jury trial, on one count of rape, as a class B felony.[1]

We affirm.

### ISSUES

1. Whether insufficient evidence of force supports the jury's conclusion that Newbill committed rape.

2. Whether the trial court committed reversible error in its instruction of the jury.

---

1. Newbill was also convicted of confinement as a class D felony. However, the trial court subsequently "vacate[d] the conviction ... for the reason that said charge [wa]s assumed within the conviction on Count I [the rape charge]." (App.12).

3. Whether the prosecutor committed misconduct.

4. Whether the trial court committed reversible error in the admission of evidence.

5. Whether the trial court's admission of some testimony by a sexual forensic nurse examiner constituted fundamental error.

6. Whether cumulative trial error combined to deny Newbill a fair trial.

### FACTS

On the afternoon of January 18, 2006, Lori Johnson picked up H.R. and H.R.'s 15–month–old son M. and took them to Lori's two-bedroom duplex. M.'s father was Keenan Lowe, Lori's son, but Keenan and H.R. were no longer together, and H.R. was living with her current boyfriend. Lori wanted to visit with her grandson, M., and H.R. wanted to use Lori's laundry facilities. Lori and H.R. had maintained a close relationship, talking daily, and the plan that afternoon was for Lori to take H.R. home when she finished her laundry. Lori left the residence about 4:30 p.m. to run some errands, leaving H.R. and M. there alone.

At approximately 8:30 p.m., H.R. answered the telephone; Newbill, Lori's brother, informed her that he was coming to the residence to watch a television program. Newbill considered H.R. his niece. Newbill arrived at Lori's residence at approximately 9:30 p.m., bringing some pornographic magazines with him. H.R. proceeded to put M. to bed in the bedroom. While H.R. was in the bedroom, she heard Lori come in, but then Lori left before she could talk to her.

Newbill told H.R. that Lori was coming back. Newbill was drinking wine and offered some to H.R.; she took "a sip to taste" it. (Tr. 97). Newbill also found some marijuana belonging to Lori. He smoked a marijuana blunt; H.R. had "two puffs" of it but felt no effect. (Tr. 52, 96). H.R. went back to the bedroom, as M. had awakened, and Newbill came in and spent a few minutes playing with the boy. After talking in the bedroom for awhile, both went back to the living room and continued to talk. Lyndon Semple, Lori's boyfriend, called to say he would be arriving late.[2]

H.R. went back to the bedroom, where she lay on the bed next to her sleeping son and watched television. Lyndon arrived home between 10:30 and 11:00 p.m. H.R. heard him come in and shower in the bathroom (which is between the two bedrooms), and then she fell asleep.

H.R. felt the bedcovers move, and then Newbill was "rubbing [her] leg, kissing on [her], trying to pull [her] shirt up, kissing on [her] stomach." (Tr. 58). Newbill had "a scary look" on his face and "was breathing heavily." (Tr. 62). H.R. "said, what are you doing, please don't," and "pushed him away." *Id.* Newbill said, "trust me, I could show you what a real man can do instead of these punks." *Id.* H.R. "said, no" and "told him [he was] making [her] feel really uncomfortable." *Id.* Newbill then "stood up" and "said we can do this the hard way, we can do it the easy way . . . you better have those pants off when I get back in this room." *Id.* at 58, 59. H.R. "said no, I'm not doing it Larry, I'm not doing it." (Tr. 59).

Newbill left the room, but then came back and "said, didn't I tell you to have those clothes off." *Id.* H.R. "said I'm not doing it." *Id.* H.R. testified that at this point, she "realized [Newbill] had a knife in his hand," and that he "had it up to [her] neck." *Id.*

---

**2.** Semple worked a 2:00 p.m.–10:00 p.m. shift.

H.R. was backed against the bed's headboard. Newbill ordered her "to scoot down" and "take those pants off." *Id.* H.R. again "said, I'm not doing it Larry, I'm not doing it." *Id.* Newbill pulled her toward him on the bed, "pried [her] legs open and pulled [her] pants off." *Id.* H.R. "kept trying to talk to him"—reminding him that his nephew was there asleep on the bed next to her, and mentioning Lori and Lyndon. *Id.* Newbill told her that Lori had come back and that she and Lyndon had left. Newbill "said, aren't you going to insert my penis," and she "said, no, I don't want to do this." *Id.* Despite H.R.'s protestations, Newbill proceeded to insert his penis in her vagina and had sexual intercourse with her.

H.R. testified that afterward, Newbill asked her to promise that she would not tell his family, and she agreed—in fear "he would try to hurt her [her] again." (Tr. 72). Newbill then had a "smirk on his face" and said he "was going to tell Keenan that [he] just [had] a free piece of ass." *Id.*

H.R. went to the bathroom and cried. When she looked in the mirror, she saw a fresh red mark on her neck. In the meantime, Newbill had left the bedroom. H.R. went back to the bedroom, curled up in the bed and "rocked [her]self." (Tr. 65). She heard the microwave, which indicated to her that Newbill had prepared some food, and later she heard him snoring. There was no telephone in the bedroom; it was too late for a bus; and she was too far away to walk home with her son at that late hour.

Shortly after 5:00 a.m., H.R. realized that she, M. and Newbill were not the only persons in the residence when she heard Lyndon get up. She went to the other bedroom, and when she tried to talk, she "just broke down crying." (Tr. 67). Lyndon testified that H.R. kept saying "please take me home, please take me home, please take me home." (Tr. 133). Lyndon "keep [sic] on askin' her why" and H.R. "told [him] that Larry rape [sic] her." [3] (Tr. 134). Lyndon told her that he absolutely had to leave right then to take a friend to work, but that he would come back for her. Lyndon handed her Lori's cordless telephone and told her to lock herself in the bedroom with M. and that he would call her to check on her until he returned. Lyndon called her twice before arriving to take her home.

Lyndon told H.R. to get her things and M. and get in his vehicle. Just as they were leaving, Lori arrived. Lyndon did not stop "because [H.R.] keep [sic] on saying she's scared." (Tr. 136). When H.R. got home, she put M. to bed, and then Lori called. H.R. told her that Newbill had raped her. Lori told H.R. to call the police and proceeded to call the police herself. As H.R. "was about to" call the police, she received a call from them. (Tr. 77). The call was recorded, and reflects that the 9-1-1 dispatcher advised her that an officer was on the way, inquired about whether she was injured, and listened to H.R.'s account of what happened to her. Over Newbill's hearsay objection, the recording was "received in evidence," (Tr. 78), and played for the jury. The jury was also given a transcript "as an aid," to "assist" them as they listened but not to be taken to the jury room during deliberation. (Tr. 78, 79).

Officer Brian Baker was immediately dispatched to H.R.'s home the morning of January 19th. He testified that he found

---

**3.** Lyndon's testimony reflects the fact that he is a recent immigrant and still struggling with conversational English.

her "extremely distraught." (Tr. 173). Baker further testified that when telling him what had happened, he "had to stop her" several times because he "couldn't understand what she was saying. She just sobbed and cried and carried on...." (Tr. 174). Baker called for an ambulance, which transported H.R. to the hospital. Detective Daniel Shumaker met H.R. at the hospital at 8:19 a.m. Shumaker testified that when "telling ... what happened," H.R. "became very upset" and had to pause several times ... "to regain her composure and continue...." (Tr. 306).

At the hospital, H.R. was subjected to a ninety-minute examination by Patricia Farrell, a trained and certified sexual assault nurse examiner ("SANE").[4] At trial, without objection, Farrell testified to the following:

- H.R.'s vagina area was "extremely red ... and very irritated." (Tr. 202).
- The area where Farrell observed the irritation was "very painful and had been since" the intercourse with Newbill, according to H.R. *Id.*
- The area was "more red than normal" and might "very well" reflect "forced sex," sex without the "normal lubrication" of consensual sex. (Tr. 203).
- The "whole" vaginal area was more red than normal; the labial area was "very reddened"; and the cervix was also red. (Tr. 205).
- The red and irritated areas indicated to Farrell that H.R. had suffered sexual trauma.

Farrell also testified that she observed a red mark on the side of H.R.'s neck. Farrell's report of her examination, entered into evidence without objection, notes this finding, and Farrell further testified that the ambulance EMTs had noted the red mark on "their charts." (Tr. 223). An hour after Farrell's examination, the emergency room physician examined H.R. and also observed redness in H.R.'s vaginal area.

Newbill was interviewed on the morning of January 19th by detectives Jay Rosen and Shumaker. At 9:32 a.m., he signed an advice of rights form and provided the following information. Newbill regarded H.R. as "his niece" and considered the idea of his having sex with her as being "gross," unequivocally stating "that he did not have sex with her." (Tr. 281, 282). Newbill agreed to provide DNA samples, asserting that "his DNA would not be found anywhere on [H.R.]." (Tr. 282). After he was advised that the State would be charging him with rape, Newbill "ripped the [consent] form up and threw it in the trash." (Tr. 284). Newbill then proceeded to give a sworn, taped statement, in which he asserted that H.R.'s account of being raped was "a sympathy" ploy to "win back" Keenan. (Tr. 285).

After a break in the interview, Newbill was advised that H.R. had been examined at the hospital, and semen might have been found in her vagina. Newbill stated that it was "probably her boyfriend's semen" because he "didn't do anything like that." (Tr. 287). A search warrant for Newbill's bodily fluids was issued, and samples were collected at the hospital— with Newbill "still continuing to say" that his DNA was "not going to be in her, ... not going to be on her." (Tr. 289). After Rosen transported Newbill back to the jail

---

4. Farrell testified that she was certified a SANE in 1998 after receiving special training that included the interviewing of patients who reported being sexually assaulted "for their medical care" and "how to collect forensic samples," and multiple supervised vaginal examinations of patients who did not allege an assault in order to be able to identify abnormalities indicative of a sexual assault. (Tr. 188).

lockup, Newbill told him he "want[ed] to change [his] story." (Tr. 290).

Newbill was again advised of his rights, at approximately 2:00 p.m. In his afternoon statement, Newbill admitted "that he did have sex with [H.R.]," and that he "had lied" in the earlier statement, but he declared that the sex had been "consensual." (Tr. 292). When asked to provide details of their sexual activity, Newbill said that they were "talking" and "one thing [led] to another, and they ha[d] sex." (Tr. 293). When asked several times to "be specific," Newbill repeatedly said "blah, blah, blah, blah" when describing what happened. *Id.* The only other detail Newbill provided was that they both had smoked marijuana earlier.

On January 24, 2006, the State charged Newbill with rape while armed with a deadly weapon, a class A felony; and criminal confinement while armed with a deadly weapon, a class B Felony. On March 1, 2006, the State added the allegation that Newbill was an habitual offender.

Newbill was tried by a jury September 21–22, 2006. The jury heard the above facts from the testimony of H.R., the police officers, the nurse, and Lyndon. H.R. affirmed that it was her voice on the recording of her conversation with the 9–1–1 dispatcher. H.R. also testified that when Lyndon left, she did not call 9–1–1 because she was afraid for herself and her son— afraid that there might be sirens, or that when the police came to the door, Newbill might harm them. Two knives found in Lori's residence were admitted into evidence. However, H.R. could not identify either knife as being the one Newbill had held to her neck during the assault.

Without objection, the jury heard Farrell's thorough explanation of her background, training, and experience as a SANE. She testified that she had been conducting sexual assault examinations since 1998 and was certified in that regard. She also testified that her training enabled her to distinguish between normal and abnormal examination findings. In response to jury questions, Farrell opined that the redness she observed in this case "would not happen from normal sexual relations." (Tr. 227). On cross-examination, however, Farrell conceded that redness could result from consensual sexual relations.

Farrell testified that upon observing the red mark on the side of H.R.'s neck, she asked "her about it." (Tr. 194). Newbill objected "to hearsay." *Id.* The State argued the matter was "part of her medical treatment," and the trial court overruled the objection. *Id.* The State later questioned Farrell about what H.R. said "happened to her," as "history" for H.R.'s "medical treatment." (App.207). Farrell began her testimony that H.R. "told her" she had gone to Lori's to do her laundry, and that her son was "asleep in the bedroom—." *Id.* At this point, Newbill objected that the testimony did "not sound like information relative to a diagnosis" but rather was "parroting the statement of [H.R.]." *Id.* The State responded that Farrell had testified that part of the SANE protocol involved "making sure there's a safety plan as part of her medical treatment," *id.,* and the trial court overruled Newbill's objection.

Admitted into evidence were photographs of the bedrooms and the bathroom; in the latter can be seen pornographic magazines that Lori testified had not been there when she left. A forensic DNA analyst testified that H.R.'s DNA was present on penile swabs from Newbill, and the vaginal swabs of H.R. contained Newbill's DNA. Lori testified that she was crying when she called H.R.'s home on the morning of January 19th while Officer Baker was there, and told him that she was also afraid of her brother.

Newbill took the witness stand. He testified that after Lyndon had gone into his bedroom, he went into the bedroom where H.R. and M. were. He testified that he and H.R. were talking about things that troubled her, she began to cry and then "g[ave] him a hug," after which "[they] kissed" and "one thing led to another." (Tr. 343). He also testified that it was his own sister, Lori, who had reported to police that he raped H.R. He admitted that he had six previous felony convictions— five for theft, and one for escape. He agreed that he had "quite a history of being a dishonest person," and that he "straight up lied" when he said in his sworn statement that he had "never had sex with" H.R. (Tr. 357, 358).

The jury returned verdicts finding Newbill not guilty of rape with a deadly weapon, a class A felony, but finding him guilty of rape, as a class B felony. Similarly, the jury returned verdicts finding Newbill not guilty of criminal confinement with a deadly weapon, a class B felony, but guilty of criminal confinement, as a class D felony.[5]

### DECISION

#### 1. Evidence to Support Conviction

Newbill's insufficiency argument is essentially as follows: the State charged him with rape, as a class A felony, based on the allegation that he held a knife to H.R.'s throat; the jury found him "not guilty of rape while armed with a knife and not guilty of criminal confinement while armed with a knife"; H.R. did not testify that he pinned her down, held his hand over her mouth, or threatened her or that she was in fear for her life; and, therefore, there is "insufficient evidence of force or evidence

of force" to convict him of rape. Newbill's Br. at 13, 12. We disagree.

The standard of review for the claim that a conviction is not supported by sufficient evidence is as follows:

When reviewing the sufficiency of the evidence to support the conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder *could* find the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind.2007) (quotations and citations omitted, emphasis in original).

Indiana law provides that "a person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when the other person is compelled by force or imminent threat of force . . . commits rape, a Class B felony." Ind.Code § 35-42-4-1. As our Supreme Court explained in *Tobias v. State*, 666 N.E.2d 68, 72 (Ind.1996), the offense of committing rape requires the State to prove that the victim's "submission was compelled by force." *Tobias* further noted that in the

---

5. As noted earlier, the trial court vacated the criminal confinement conviction after sen- tencing.

context of a sufficiency-of-the-evidence analysis, the statute's phrase *"other person is compelled,"* I.C. § 35–42–4–1, (emphasis in original),

> demonstrates that it is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is thus whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance.

*Id.* at 72. Further, in the sufficiency context, "the force necessary to sustain" a conviction of rape "need not be physical," and "it may be inferred from the circumstances." *Bryant v. State,* 644 N.E.2d 859, 860 (Ind.1994) (citing *Jones v. State,* 589 N.E.2d 241, 242–43 (Ind.1992); *Smith v. State,* 500 N.E.2d 190 (1986); and *Jenkins v. State,* 267 Ind. 543, 545, 372 N.E.2d 166, 167 (1982)).

H.R. testified that she told Newbill "no" over and over and over again. H.R. further testified that after she told him that she would not agree to have sex with him, Newbill told her that "we can do this the hard way, we can do it the easy way. I want those pants off." (Tr. 58). Newbill told her to "have those pants off when [he] got back," and left the room. *Id.* When Newbill returned to the room, H.F. testified, he had a knife in his hand and proceeded to pull her toward him on the bed, pulled off her pants, and insert his penis in her vagina.

■ Newbill asserts that because the jury acquitted him of the charge of rape with a deadly weapon, the jury determined that there was no knife involved. Newbill denied having a knife and argued vigorously to the jury that H.R. could not identify either knife admitted into evidence as be-ing the one held to her neck, and that neither had been fingerprinted or tested for the presence of DNA. It is possible the acquittal was the result of the jury's belief that the State was required to provide proof of identification of a specific knife by the victim and corroborating evidence of Newbill's use of a knife in order to convict him of rape as a class A felony. We will not speculate as to the jury's reason for arriving at the verdict of acquittal. However, regardless of the jury verdict pertaining to whether a *knife* was held to H.R.'s neck, the red mark on H.R.'s neck could still support the reasonable inference that some object had been applied to her neck with sufficient force to cause a mark that remained visible for several hours. Further, Farrell, whose credentials and experience as a SANE qualified her as an expert in the subject matter of examining possible victims of rape, testified that the specific areas of H.R.'s vagina that she examined and observed were red and irritated—an indication of forced sex. Also, H.R. experienced pain subsequent to the sexual act, from which can be drawn the reasonable inference that the sex was compelled. Finally, we note that the jury, as the trier of fact, was in the best position to observe the demeanor of both H.R. and Newbill as they testified, and that the jury is charged with assessing their credibility. We find sufficient evidence to support the jury's reasonable conclusion that H.R.'s submission to the sex act with Newbill "was compelled by force." *Bryant,* 644 N.E.2d at 861. Therefore, sufficient evidence supports the conviction.

## 2. *Instructions*

Newbill next argues that the trial court committed reversible error in its instruction to the jury. Despite his counsel's objection that the instruction was impermissibly "mandatory," because it "man-

dat[ed] that [the jury] only consider the victim's perspective and not the assailant," (Tr. 328), the trial court overruled the objection and specifically instructed the jury as follows:

> It is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance. The element of force may be inferred from the circumstances.

(App.33). Newbill acknowledges that the instruction mirrors language found in *Tobias,* 666 N.E.2d at 72 (quoted in the preceding discussion). However, he correctly observes that in *Tobias,* the language was used in the course of appellate review of a challenge to the sufficiency of the evidence. He further reminds us that our Supreme Court has repeatedly declared that "[t]he mere fact that certain language or expression [is] used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to the jury." *Ludy v. State,* 784 N.E.2d 459, 462 (Ind.2003) (citations omitted). Newbill then posits a hypothetical case whereby the above instruction could result in the conviction of an accused who reasonably believed—based upon the *objective* perspective of the alleged victim's actions—that the other person had consented to engaging in sex.

■ We tend to agree that the particular instruction, as given, may not properly reflect the perspective from which a *jury* should consider the evidence of forceful compulsion. Further, acknowledging the possible effect of such an instruction in the hypothetical Newbill presented,[6] it appears to us that the "perspective" for a jury's consideration of the evidence of forceful compulsion in a rape trial might better be described as either the "objective perspective of the victim" or the "reasonable perspective of the victim." [7] Therefore, we would discourage trial courts from using this language as an instruction in the future.

■ On the other hand, we note that Newbill's original Appendix contained *only* the instruction that he claims was error. As the State correctly notes, when addressing a claim of instructional error, we determine whether the instructions "as a whole, misstate the law or otherwise mislead the jury." *Ham v. State,* 826 N.E.2d 640, 641 (Ind.2005). Such a review is not possible when we are only presented with a single instruction. Newbill responds that the full set of instructions "were available to the State." Reply at 3. However, it is the *appellant's* burden on appeal to present this court with a record complete enough to sustain his argument. *See Purdy v. State,* 708 N.E.2d 20, 23 (Ind.Ct.App. 1999). That said, we acknowledge that Newbill has now submitted a Supplemental

---

6. Newbill posits that "a female may have been constantly beaten in the past, to the extent that she fears telling any man 'no' when he asks her for sex, least [sic] she again be beaten. A man who otherwise innocently has sex with this woman would be committing rape because from her perspective, she perceived any requests for sex as a threat of force which compelled her to have sex." Newbill's Br. at 14–15.

7. Newbill argues in his reply brief that the instruction repeatedly refers to H.R. as a "victim" rather than "alleged victim." Reply at 4. Trial counsel did not object on this basis, and we note that various other instructions also refer to "the victim." (Supp.App.199, 200).

Appendix with a full set of the trial court's instructions.

In its preliminary instructions, the trial court directed the jury to "consider all the instructions together" and "not single out any certain sentence or any individual point or instruction and ignore the others." (Supp.App.179). It gave the jury the definition of both rape as a class B felony and as a class A felony. The trial court instructed the jury at length as to the State's burden to prove "beyond a reasonable doubt" that Newbill had committed the crimes charged, including proof of "each element" of the crimes. (Supp.App. 185). The jury was instructed that its role was to determine "the value to give" each witness's testimony. (Supp.App.186).

In its final instructions, the trial court again reminded the jury to not focus on any single instruction. It specifically instructed the jury that the State "must have proved each of the following elements:" that Newbill "(1) knowingly or intentionally (2) had sexual intercourse with [H.R.] when (3) [H.R.] was compelled by force or imminent threat of force," and must prove "each of these elements beyond a reasonable doubt" in order for the jury to find Newbill "guilty of rape" as a class B felony. (Supp.App.195). The trial court then defined for the jury the term "intentionally":

> A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. If a person is charged with intentionally causing a result by his conduct, it must have been his conscious objective not only to engage in the conduct but also to cause the result.

(Supp.App.197). It defined the term "knowingly":

> A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he

is doing so. If a person is charged with knowingly causing a result by his conduct, he must have been aware of a high probability that his conduct would cause the result.

*Id.* Finally, the trial court provided an instruction that defined "sexual intercourse." (Supp.App.198).

 Instructing a jury is a matter assigned to trial court discretion, and an abuse of that discretion occurs when the instructions, as a whole, mislead the jury as to the law in the case. *Ham,* 826 N.E.2d at 641. We cannot agree that the single instruction challenged by Newbill impermissibly mandated that the jury focus on H.R.'s perspective rather than focus on the necessary statutory elements in determining *Newbill's* criminal intent. Therefore, we find that read as a whole, the instructions properly informed the jury that it was to consider the testimony and evidence presented, and to judge that evidence in order to reach its conclusion of whether the State established, beyond a reasonable doubt, that Newbill knowingly or intentionally exerted force that compelled H.R. to submit to sexual intercourse. Accordingly, we do not find that the trial court abused is discretion by giving the instruction at issue.

### 3. *Prosecutorial Misconduct*

As noted above, at trial on September 21, 2006, over the hearsay objection of Newbill, the State played to the jury the recording on a CD of H.R.'s conversation with the 9–1–1 dispatcher on the morning of January 19th and provided a transcript (Exhibit 16) as an aid to their listening. The State identified the CD recording as Exhibit 15, and the trial court admitted it into evidence. On April 17, 2007, Newbill filed his notice of appeal. On July 30, 2007, the reporter filed notice that the transcript and exhibits were prepared. On

August 15, 2007, apparently after listening to the CD (Exhibit 15 [8]), Newbill filed a motion to certify statement of evidence. We do not have Newbill's motion, but we have the affidavit of the trial court as to the August 31, 2007, hearing held on his motion, and the trial court's sworn statement that it had learned after the jury finished its deliberation that, during its deliberation, the jury had heard a portion of Exhibit 15 that was not H.R.'s voice—at which point the jury turned off the recording. The trial court's affidavit also includes the testimony of its bailiff, Jan Ermel, taken at the hearing, and we have the affidavits of both the prosecutor and the defense attorney from Newbill's trial.

Ermel testified that her recollection of the events occurring some eleven months earlier, in September of 2006, was that during deliberations, a juror told her that when they were listening to the recording, they "heard a different voice, so [they] shut it off, because [they] didn't think [they] should be hearing it." (App.21). She understood that when "they heard this voice," they immediately "shut it off." (App.24).

Newbill begins by noting that before trial, the trial court granted his motion in limine to preliminarily bar evidence of any previous alleged crimes, wrongs or bad acts. Accordingly, Newbill argues that it was prosecutorial misconduct that constitutes reversible error for the State to have proffered Exhibit 15 as the statement of H.R. when it also contained Lori's conversation with the police *and* to have sent this unedited CD with that unadmitted and "prejudicial" material to the jury for its deliberations. Newbill's Br. at 17. We cannot agree.

When we review a claim of prosecutorial misconduct, we conduct a two-part analysis. *Nolan v. State*, 863 N.E.2d 398, 405 (Ind.Ct.App.2007), *trans. denied*. First, we determine whether the prosecutor committed misconduct, and, second, we determine "whether the misconduct, given the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected." *Id.* "The gravity of the peril is determined by considering the probable effect of the misconduct on the jury's decision, rather than the degree of the impropriety of the conduct." *Id.* (quoting *Robinson v. State*, 693 N.E.2d 548, 551 (Ind.1998)).

Although the record provides no support for the conclusion that the State was aware that Exhibit 15 contained Lori's earlier conversation with the 9–1–1 dispatcher, we do find that it was negligent conduct, bordering on misconduct, for the State not to have determined beforehand that Exhibit 15 contained nothing more than what it was represented to contain. That said, the question becomes whether the inclusion of Lori's conversation had such a "probable persuasive effect" as to put Newbill "in a position of grave peril." *Id.* We think not.

First, it is highly questionable that the jury listened to the first part of the CD, that with Lori's statement. Second, we have listened to Exhibit 15, and without a transcript for assistance, we can hear Lori state that she is at her mother's; that H.R. said Newbill raped her; where H.R. and Newbill can be found; that Newbill is "on parole" and "just got out of jail"; and that the police need to talk to H.R. Ex. 15. That aside, Newbill testified at trial and admitted to his extensive criminal history. Further, H.R. testified that as she was trying to dissuade Newbill, to "see

**8.** Exhibit 15 includes both the recording of H.R.'s conversation with the 9–1–1 dispatch- er, played for the jury, and the earlier call made to 9–1–1 by Lori.

if maybe he would change his mind and not do this to [her,]," he said he "didn't care ... [he was] going back to jail anyway," and she said, "why would you want another charge on you, Larry." (Tr. 60). The jury had already received information that suggested Newbill was on parole or had recently been released from incarceration. Therefore, we do not find that even if the jury had listened to Lori's statement on the CD, the "probable persuasive effect" would have placed him "in a position of grave peril to which he should not have been subjected" so as to constitute prosecutorial misconduct that warrants reversal of his conviction. *Nolan*, 863 N.E.2d at 405.[9]

### 4. *Admission of Evidence*

 The trial court has inherent discretionary power in the admission of evidence. *McManus v. State*, 814 N.E.2d 253, 264 (Ind.2004), *cert. denied.* The trial court's decision regarding the admissibility of evidence is reviewed only for an abuse of that discretion. *Id.* An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Saunders v. State*, 848 N.E.2d 1117, 1122 (Ind.Ct.App.2006) (citing *Carpenter v. State*, 786 N.E.2d 696, 702–03 (Ind.2003)).

Newbill first argues that the trial court erred in permitting Farrell, over his objection, to testify to numerous statements by made to her by H.R. about the sexual act with Newbill. He contends that contrary to the trial court's ruling, these statements were hearsay that did not fit the exception of Indiana Rule of Evidence 803(4), which provides as follows:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonable pertinent to diagnosis or treatment.

Newbill reminds us that according to Farrell's own testimony, she was not treating H.R. or obtaining a medical diagnosis, but collecting evidence. We agree that Farrell's testimony about what H.R. told her may have been inadmissible hearsay that did not fit the diagnosis/treatment exception in these circumstances.

 However, the record reflects that Farrell's testimony was offered as expert testimony—without Newbill objecting that she was not an expert. As noted above, Farrell testified as to her education, training, certification, and experience regarding her expertise as a SANE. "[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify" to that expert's "specialized knowledge," including the use of that knowledge "in the form of an opinion." Ind. Evidence Rule 702(a). The expert may rely on facts "made known to the expert" in reaching her expert opinion. Evid. R. 703. Consistent with her expertise, Farrell collected evidence in accordance with a specific rape protocol. H.R.'s reporting of the events that led her to experience the pain she presented at the examination were facts used by Farrell to reach her expert opinion of whether H.R. had been compelled by force to submit to the sex act. The reported facts were also considered by Farrell when she applied her expertise to opine whether the physi-

---

**9.** Without citation to authority, Newbill also argues that the jury's receipt of the recording of Lori "constitute[s] fundamental error." Newbill's Br. at 18. On the merits, however, this argument must fail for the same reason as does his argument of prosecutorial misconduct.

cal manifestations—redness and irritation in particular vaginal areas—resulted from forced sex, when natural lubrication was less likely, or from rough consensual sex. Hence, we find that Farrell's testimony regarding H.R.'s account of the sexual act may properly be admitted based upon Farrell's status as an expert witness. Moreover, virtually all of Farrell's testimony about what H.R. told her is cumulative of H.R.'s earlier testimony before the jury. The admission of hearsay is not necessarily grounds for reversal, especially where it is merely cumulative of other evidence admitted. *Mathis v. State,* 859 N.E.2d 1275, 1280 (Ind.Ct.App.2007).

Newbill also argues that the trial court erred in permitting the State to play for the jury, over his hearsay objection, the recording of H.R.'s conversation with the 9–1–1 dispatcher. He contends that contrary to the trial court's ruling, this evidence did not qualify as an "excited utterance," asserting that several hours had elapsed since the sexual act, and citing cases which considered the passage of time.

■■■ An "excited utterance" is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," Ind. Evidence Rule 803(2), and is "not excluded by the hearsay rule." Evid. R. 803. "The amount of time that has passed between the event and the statement is relevant but not dispositive." *Noojin v. State,* 730 N.E.2d 672, 676 (Ind.2000). The issue is "whether the declarant was still under the stress of excitement caused by the startling event when the statement was made." *Id.* (quoting *Yamobi v. State,* 672 N.E.2d 1344, 1346 (Ind.1996)). The trial court's ruling as to the application of this exclusion is reviewed "for an abuse of discretion." *Id.*

■■ The record reflects that the sexual act occurred sometime between 2:00 and 3:30 a.m., and that Lyndon probably delivered H.R. to her home before 7:00 a.m. It was 7:34 a.m. when Officer Baker contacted another officer to locate Newbill. Baker arrived at H.R.'s home shortly after the recorded 9–1–1 conversation. Baker testified that H.R. was in an extremely distraught and emotional state when he arrived and attempted to interview her, having to stop several times for her to regain her composure and for him to understand her. Further, H.R. testified that she was awakened by Newbill in her bed, before he proceeded to rape her. She was left in a bedroom without a telephone, along with her son, and in a residence where she believed they were alone with the rapist—who was on a couch in the room between the bedroom and door to exit the residence. Later, when she heard Lyndon's presence, she pleaded with him to take her and M. home. Lyndon instructed her to lock herself in the room until he returned. After Lyndon left, Newbill remained on the couch between her and the exit door. Lyndon returned and took her home. By the time H.R. had put her child to bed, Lori called and encouraged her to call the police. At this point, H.R.'s conversation with the 9–1–1 dispatcher occurred. We do not find that the trial court abused its discretion when it determined that H.R. was still under the stress of the excitement of the startling event.

### 5. *Fundamental Error*

Although conceding that there was no objection to Farrell testifying as an expert, and without any authority, except for the proposition that evidence not objected to at trial "may" be considered as fundamental error, Newbill argues that it was fundamental error for Farrell "to give expert

opinions." Newbill's Br. at 23. We cannot agree.

■ Evidence Rule 702(a) provides that

> [i]f ... specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether the witness has "specialized knowledge" that is "beyond the knowledge generally held by lay" persons and will be helpful to the jury is a matter entrusted to the discretion of the trial court. *Malinski v. State*, 794 N.E.2d 1071, 1085, 1086 (Ind. 2003).

■ Farrell testified that she had been a registered nurse for thirty-six years, and associated with emergency department medicine since 1979. She further testified that she was certified as a SANE in 1998, and had worked in that capacity since then. She explained each step of the sexual assault examination process, and why it was done. Farrell then testified using exhibits to demonstrate the findings as to H.R. We find that Farrell's specialized knowledge was helpful for the jury to understand the import of the exhibits—which reflected physical findings related to alleged forced sexual activity, and also the meaning of those findings. Therefore, we find no abuse of discretion in the trial court's permitting her to testify as an expert. Accordingly, there is no fundamental error as the matter did not so prejudice Newbill's rights as "to make a fair trial impossible." *Benson v. State*, 762 N.E.2d 748, 755 (Ind.2002).

### 6. *Cumulative Error*

Again citing no specific authority, Newbill argues that the "cumulative effect" of all his asserted errors "operated together to deny [him] a constitutionally fair and impartial trial." Newbill's Br. at 24. It may be true, arguably, that Newbill did not have a perfect trial, but given H.R.'s testimony, which was subject to vigorous and extensive cross-examination, and the testimony provided by other witnesses of various corroborating details pertaining to the incident, we cannot conclude that his trial was not constitutionally fair or that he was not afforded the basic and elementary principles of due process. *Benson*, 762 N.E.2d at 755.

Affirmed.

BRADFORD, J., concurs.

BAKER, C.J., concurs in result with separate opinion.

BAKER, Judge, concurring in result.

I agree with the decision to affirm Newbill's conviction for rape, but I part ways with the majority's determination that the 911 call qualified an excited utterance in these circumstances. Even so, the majority acknowledges that H.R. testified at Newbill's trial and verified her own voice on the 911 tape. Op. at 390. Moreover, H.R. was subject to cross-examination, and she did not tell the police dispatcher in the 911 call anything that she did not also tell the jury. Therefore, even though it may have been error to have admitted the 911 tape under the under the excited utterance exception to the hearsay rule, the error was harmless because the statements that H.R. made to the police dispatcher were cumulative of her trial testimony. *See Buchanan v. State*, 767 N.E.2d 967, 970 (Ind. 2002) (holding that improperly admitted evidence is harmless error if the erroneously admitted evidence was cumulative of other evidence that was properly admit-

ted). For these reasons, I concur in result.