FILED

Jan 23 2024, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

James Harper
Harper & Harper, LLC
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Morales,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 23, 2024

Court of Appeals Case No.
23A-CR-522

Appeal from the Porter Superior
Court

The Honorable Mary A. DeBoer,
Judge

Trial Court Cause No.
64D05-2103-F1-1850

**Opinion by Judge Crone**
Judges Bailey and May concur.

**Crone, Judge.**

## Case Summary

[1] Following a jury trial, Michael Morales was convicted of two counts of level 1
felony rape and one count of level 3 felony criminal confinement. On appeal, he

contends that the State presented insufficient evidence to support his rape convictions. He also contends that the trial court erred in refusing one of his proposed jury instructions, denying his motion for mistrial, and granting the State's motion to amend the charging information during jury deliberations. Finding the evidence sufficient and no reversible error, we affirm.

## Facts and Procedural History

[2] Morales and K.M. married in February 2016 and had one child together, J.M. Throughout the marriage, Morales cycled "up and down" emotionally, and he often threatened suicide. Tr. Vol. 5 at 94. By February of 2021, the marriage was "[v]ery strained[,]" and K.M. told Morales that she wanted a divorce. *Id.* at 199. Morales suggested that the couple try a two-week separation, and K.M. agreed. On February 21, 2021, Morales moved out of the couple's apartment, taking his rifle and other firearms with him. The next day, Morales appeared at K.M.'s workplace with a dozen roses and stated that he would grant her a divorce. However, the following day, February 23, Morales went to the apartment while K.M. was at work, broke a picture frame, and tore a family photo into pieces. He texted K.M., "[D]on't do this[,]" and "You're ruining [J.M.'s] life." Tr. Vol. 4 at 143. Later that same day, Morales appeared at K.M.'s workplace and accused her of having an affair with another resident of the apartment complex.

[3] K.M. had minimal contact with Morales on February 24 and saw him briefly on the morning of February 25, when she dropped two-year-old J.M. off at Morales's grandmother's house on her way to work. K.M. worked until 10:00

p.m. and drove home. Todd Kenton, one of K.M.'s work friends, met her at the apartment. Kenton brought his AR-15 rifle with him so that he could show K.M. how to use it for personal protection. Kenton spent about thirty minutes instructing K.M. on how to use the rifle. When they were finished talking about the firearm, Morales knocked on the apartment door. He had followed K.M. home from work and had been listening to her and Kenton through the door. When K.M. realized that it was Morales at the door, she ushered Kenton into the bedroom because she knew that it would not "turn out well" if Morales knew that Kenton was in the apartment. *Id.* at 162. K.M. opened the door a few inches, and Morales pushed his way in, saying, "I heard him." *Id*. at 164.

[4] Morales searched the apartment and found Kenton in the bedroom. He accused K.M. of cheating and ordered Kenton to leave. Kenton left the apartment but did not take the AR-15, which was lying on a desk in the living room. Morales picked up the rifle and accused K.M. of "ripping [their] family apart." *Id*. at 170. Morales also stated that he did not "want to live anymore." *Id*. Morales followed K.M. into the bedroom and threatened to take custody of J.M. He then sat on the end of the bed and stated that his life was over and that he was losing his family, and he again stated that he did not want to live anymore. As Morales still held the rifle in his hand, he said, "[M]aybe I'd want to live longer if you give me oral." *Id*. at 173. K.M. believed that Morales was serious about his suicide threat because he had never threatened suicide while holding a gun in his hand. K.M. did not want to perform oral sex but complied because she was afraid of what Morales might do. K.M. placed Morales's penis in her

mouth, but after a few minutes, when his penis did not become erect, he indicated that he wanted her to stop.

[5] Morales continued to hold the rifle and ordered K.M. to call Kenton, who was still driving home to South Bend. Morales told Kenton that he would need to take care of K.M. because he planned to take "everything" from her. Tr. Vol. 6 at 16. After the call ended, Morales paced around the apartment stating that he did not want to live anymore. K.M. watched as Morales appeared to be loading or unloading the rifle. Morales ordered her to get undressed. K.M. did not want to get undressed, but she was "scared" about what Morales was going to do with the rifle. Tr. Vol. 4 at 191. K.M. got undressed and lay on the bed. *Id.* Morales climbed on top of her, still holding the gun with the barrel near her head, and told her to put his penis in her vagina. K.M. did as she was instructed. She did not want to have sexual intercourse with Morales but complied because she thought he would hurt himself if she refused. Morales told her that it would be her fault if he killed himself and that she would have to explain it to her son. After a few minutes, Morales ejaculated, and the intercourse ceased.

[6] Morales rolled off of K.M. stating, "I can't believe I did that. I'm a monster. I don't deserve to live." *Id.* at 193. K.M. scooted to the foot of the bed, feeling numb and in shock. Morales had a "weird" look on his face, and K.M. became worried that he was about to shoot himself in the head right in front of her. *Id.* The two struggled over the rifle and the magazine, and K.M. gained control of the magazine. She tried to run out of the apartment, but Morales blocked the

door and prevented her from leaving. He continued to confine her as she retreated to J.M.'s bedroom. Morales was eventually able to grab the magazine out of K.M.'s hands. K.M. got on the floor in a fetal position and placed her hands over her ears as Morales placed the barrel of the rifle to the side of his head. Morales pulled the trigger multiple times, but the rifle just "clicked." *Id.* at 201. Morales then ejected the magazine and tried to load a round into the chamber manually, but the rifle still failed to discharge when he pulled the trigger. He tossed the rifle aside and put his clothes on. He ordered K.M. to wipe the rifle free of fingerprints, which she did. Morales then went in and out of the apartment, packing and moving clothes while talking to his grandfather on the phone and telling him that he had hurt K.M. "pretty bad." Tr. Vol. 5 at 43. K.M. was able to lock the door and call 911 while Morales was out of the apartment.

[7]     Portage police officers responded to the scene just after 6:00 a.m. on February 26. Morales was in the parking lot near his vehicle, which had a flat tire. Officers questioned K.M. She told them that Morales had threatened to kill himself if she did not perform oral sex and engage in sexual intercourse with him. She further reported that she did both as Morales was holding a rifle. The officers arrested Morales. Sergeant Robert Nichols located the rifle and attempted to make the weapon safe for transport by clearing the weapon of any ammunition and engaging the safety. Sergeant Nichols was unable to engage the safety because the trigger was pulled and the rifle was in firing position. He

opened the rifle to verify that there was no ammunition in the chamber or barrel. He then secured the rifle in his vehicle.

[8] The State charged Morales with two counts of level 1 felony rape and two counts of level 4 felony sexual battery. The State later filed an amended information adding two counts of level 3 felony rape and one count of level 3 felony criminal confinement. A jury trial began on January 23, 2023. The jury found Morales guilty as charged. The trial court entered judgment of conviction on the level 1 felony rape and level 3 felony criminal confinement counts. The court sentenced Morales to concurrent thirty-year terms, with five years suspended to probation, for the level 1 felonies, and a concurrent nine-year term, with four years suspended to probation, for the level 3 felony. This appeal ensued.

## Discussion and Decision

## Section 1 – The State presented sufficient evidence to support the rape convictions.

[9] Morales challenges the sufficiency of the evidence to support his level 1 felony rape convictions. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Anderson v. State*, 37 N.E.3d 972, 973 (Ind. Ct. App. 2015), *trans. denied*. We respect the jury's exclusive province to weigh conflicting evidence, and we consider only the evidence most favorable to its verdict. *Id*. On appeal, it is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Gray v. State*,

957 N.E.2d 171, 174 (Ind. 2011). We must affirm if the evidence and the reasonable inferences drawn therefrom could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Anderson*, 37 N.E.3d at 974.

[10] To prove the two allegations of rape in accordance with Indiana Code Section 35-42-4-1(a)(1), the State was required to prove that Morales knowingly or intentionally had sexual intercourse with K.M. and caused her to perform or submit to other sexual conduct when K.M. was "compelled by force or imminent threat of force."[1] The "force necessary to sustain a rape conviction need not be physical, but ... it may be inferred from the circumstances." *Bryant v. State*, 644 N.E.2d 859, 860 (Ind. 1994). The presence or absence of force is determined from the victim's perspective, not the defendant's. *Tobias v. State*, 666 N.E.2d 68, 72 (Ind. 1996). "This test is subjective and looks to the victim's perception of the circumstances surrounding the incident in question." *E.S. v. State*, 198 N.E.3d 701, 703 (Ind. Ct. App. 2022) (citation omitted).

[11] The State's theory at trial was that Morales, while armed with a rifle, compelled K.M. to engage in both intercourse and oral sex by threatening to kill himself. Indeed, K.M.'s testimony made clear that she felt compelled to perform these nonconsensual acts because she was afraid that Morales would hurt himself if

---

[1] Other sexual conduct is defined in pertinent part as an act involving "a sex organ of one (1) person and the mouth or anus of another person[.]" Ind. Code § 35-31.5-2-221.5. The State was also required to prove that Morales committed his crimes while armed with a deadly weapon. Ind. Code § 35-42-4-1(b)(2). Morales does not challenge the sufficiency of the evidence in this regard.

she refused. Morales insists that this evidence was insufficient because the phrase "force or imminent threat of force" as used in the rape statute "contemplates a statement of intent to harm the victim or another person, not a statement of intent to commit self-harm." Appellant's Amended Br. at 21.

[12] When assessing the sufficiency of the evidence of rape, we look to the victim's perception of the circumstances to determine the presence or absence of "forceful compulsion." *Newbill v. State*, 884 N.E.2d 383, 392 (Ind. Ct. App. 2008). Indeed, the issue is simply "whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance." *Id*. As such, it is the coerced or compelled acquiescence to sexual intercourse or other sexual conduct that results from a threat that defines a rape. Morales's assertion that a defendant's threat of self-harm cannot, as a matter of law, constitute "force or imminent threat of force" misses the mark and attempts to create an exception in the rape statute that simply does not exist.

[13] Morales maintains that, even assuming a defendant's threat of self-harm can satisfy the force/imminent threat thereof required pursuant to the rape statute, the evidence presented here was insufficient to show that K.M. perceived his threat of self-harm as imminent and/or as compelling her compliance. We disagree. While holding a rifle in his hand, Morales repeatedly stated that he did not want to live anymore and that his life was over. He then twice stated to K.M., "[M]aybe I'd want to live longer if you give me oral." Tr. Vol. 4 at 173. K.M. testified that she perceived this statement as a suicide threat and to mean that Morales would hurt himself if she did not comply. After the oral sex

occurred, Morales paced around the apartment still repeating that he did not want to live anymore. As Morales held the gun in his hand, he ordered K.M. to get undressed, lay on top of her, and had sexual intercourse with her. K.M. stated that she complied because she was "scared" since Morales "had a gun in his hand" and she "didn't know what was going to happen." *Id.* at 191. This evidence is more than sufficient to support the jury's conclusion that K.M. perceived Morales's threat of self-harm as both imminent and compelling her compliance. Contrary to Morales's suggestion, the fact that he did not actually attempt to harm himself until after the rapes does not support an inference that his threat was not imminent. If anything, that evidence supports K.M.'s perception that Morales's threat of self-harm was not hollow. The State presented sufficient evidence to support the convictions.

## Section 2 – The trial court did not err in refusing Morales's proposed jury instruction.

[14]    We next address Morales's claim that the trial court erred in refusing his proposed jury instruction defining the term "threat." The proposed instruction was based upon a portion of the intimidation statute, Indiana Code Section 35-45-2-1, and provided:

> Threat means a communication, by words or action, of an intention to:
>
> (a) unlawfully injure the person threatened or another person, or damage property;
>
> (b) unlawfully subject a person to physical confinement or

restraint; or

(c) commit a crime[.]

Appellant's App. Vol. 2 at 94. The trial court refused the proposed instruction after determining that the definition of threat in the intimidation statute did not apply in the context of rape. We agree.

[15] The purpose of an instruction is "to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied* (2004). A trial court erroneously refuses to give a tendered instruction if: "(1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given." *Id.* at 1164. We typically review the trial court's manner of instructing the jury for an abuse of discretion. *Ramirez v. State*, 174 N.E.3d 181, 195 (Ind. 2021).

[16] Morales has not shown that the refused instruction correctly sets out the law in the context of the rape statute. As noted above, the language of the instruction proffered by Morales was taken from the intimidation statute, Indiana Code Section 35-45-2-1. Indiana Code Section 35-31.5-2-330 provides that the definition of "threat" set forth in Indiana Code Section 35-45-2-1(c) specifically applies to the intimidation statute. There is a difference between when a statute employs a word without defining it, such as the term threat in the rape statute,

and when our legislature promulgates specific statutory language, such as the term threat in the intimidation statute. *See Jackson v. State*, 165 N.E.3d 641, 647-48 (Ind. Ct. App. 2021), *trans. denied*. "When a statute employs a word without defining it, courts generally should apply the word's plain, ordinary, and usual meaning, unless to do so would be contrary to the Legislature's intent; but technical words and phrases should be given their technical legal definitions." *Id*. (citation omitted). We agree with the State that the definition of the term "threat" as used in the intimidation statute is a "technical legal definition" applicable only in that specific context. *See id*. Morales's proposed jury instruction did not provide a plain, ordinary, and usual meaning of the term "threat." Accordingly, Morales's proffered jury instruction was not a correct statement of the law in the context of the rape statute. Therefore, the trial court did not abuse its discretion in refusing the instruction.[2]

---

[2] Morales maintains that the trial court erred in failing to supplement the jury instructions with his proposed instruction after the jury sent questions during deliberations asking, "[Is it] still force if the victim was never personally threatened with harm to their own being[?]" and "what is [the] definition of force?" Tr. Vol. 7 at 19, 20. In response to the jury questions, the trial court proposed rereading the original jury instructions. Both parties agreed with this proposal, with defense counsel adding, "Unless you want to reconsider the threat instruction?" *Id*. at 20. The trial court indicated that it would not reconsider the threat instruction, emphasizing that the jury's questions involved "threat, not force. So – I mean but good try." *Id*. While we acknowledge that supplemental jury instructions have the potential to assist a deliberating jury, *Ramirez*, 174 N.E.3d at 195, an instruction that is not responsive to the jury's questions, and more importantly, is not a correct statement of the law applicable to the case, would never be appropriate.

## Section 3 – The trial court did not abuse its discretion in denying Morales's motion for mistrial.

[17] Morales contends that the trial court abused its discretion in denying his request for a mistrial. "Whether to grant or deny a motion for a mistrial lies within the sound discretion of the trial court." *Isom v. State*, 31 N.E.3d 469, 480 (Ind. 2015), *cert. denied* (2016). "On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury." *Higgason v. State*, 210 N.E.3d 868, 882 (Ind. Ct. App. 2023) (citation omitted), *trans. denied*. "When determining whether a mistrial is warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision." *James v. State*, 613 N.E.2d 15, 22 (Ind. 1993). "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Isom*, 31 N.E.3d at 481 (quoting *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001)).

[18] The AR-15 rifle that Morales possessed during the sexual assaults was discussed and handled by two witnesses, Sergeant Nichols and Kenton, during cross-examination by the defense. Sergeant Nichols handled the weapon and explained how he took possession of it at the scene and that a round of ammunition was not found in the chamber or barrel. The second witness, Kenton, was asked by defense counsel to handle the weapon and verify that it

was empty of ammunition, which was part of the defense theory that the weapon was not actually loaded during the assaults. When Kenton handled the weapon, a round fell out of the weapon onto the ground. Defense counsel continued his cross-examination, and Kenton was excused after redirect. Following a recess, defense counsel moved for a mistrial because this "brings in evidence that no one knew" and the "effect of that is prejudicial." Tr. Vol. 6 at 49. The State also expressed its shock that a round was in the weapon but argued that Morales had not explained how he was prejudiced by this discovery. Indeed, the State argued, "[I]f anything, it's going to prejudice the State, because we just told the jury that [the weapon] was clear" when Sergeant Nichols located it. *Id*. at 50. Moreover, the State pointed out that K.M. had been consistent in her testimony that she did not know whether the weapon was loaded during the assaults, so whether the round now discovered in the firearm could be attributed to Morales loading the weapon at some point, or to Kenton loading it prior to leaving the apartment, did not change the State's theory of the case or the "force issue." *Id*. at 55. The State argued that "an admonishment would be proper, if even that is needed. But a mistrial would be over the line." *Id*. at 51.

[19] After considering the gravity of the peril, the trial court determined,

> The bottom line here in my estimation is that the issue is whether – that if he had a weapon, whether it was loaded or not, that could be received as a threat. And so – you know, and she has sat here the whole time saying, I didn't know if it was loaded or not … so for purposes of argument, you guys need to argue what you

need to argue, but I'm going to say, no [to the motion for mistrial] and we are going to carry on.

*Id.* at 56. The trial court then permitted the State to recall Sergeant Nichols to explain to the best of his ability how a round of ammunition could have been left in the weapon despite the authorities believing that the weapon was clear when they secured it at the scene. Sergeant Nichols explained that it was likely Morales's act of trying to manually insert a round into the chamber after the assaults that caused the rifle to malfunction and the round to be displaced in an area that the sergeant could not see when he inspected the weapon.[3] Morales did not renew his motion for mistrial after Sergeant Nichols testified, nor did he suggest that any additional remedial measures be taken.

[20] Under the circumstances, we cannot say that the trial court abused its discretion in denying the motion for mistrial. We agree with the trial court that Morales was not subjected to grave peril due to the round of ammunition falling from the rifle during Kenton's cross-examination. As already noted, K.M. repeatedly admitted that she was unsure whether the rifle was loaded during the sexual assaults, and, based on both the State's and the defense's theories of the case, the actual status of the weapon when police recovered it is not germane to the

---

[3] The record indicates that the deputy prosecutor called his supervisor and consulted with "a gaggle of prosecutors" to determine how to handle the bullet that had fallen from the rifle during trial. Tr. Vol. 6 at 57. Based upon this consultation, the deputy prosecutor recommended that the court mark the bullet as an exhibit and place it with the magazine, which the trial court did. Defense counsel did not object to the procedure.

issue of the presence or absence of "forceful compulsion" at the time of the assaults. Moreover, Morales did not object to the curative measures permitted by the trial court to explain this surprise evidence. In sum, the extreme remedy of a mistrial was unwarranted. Accordingly, we find no abuse of discretion.

## Section 4 – The trial court did not abuse its discretion in granting the State's motion to amend the charging information during deliberations.

[21] The record indicates that the original charging information alleged one count of level 1 felony rape based on sexual intercourse and one count based on other sexual conduct. However, in April of 2021, the State filed amended charges with the intent of simply correcting one of the statutory citations listed for both counts.[4] Apparently, the term "sexual intercourse" was inadvertently removed from Count 1 and replaced by "other sexual conduct." Appellant's App. Vol. 2 at 21, 79. Accordingly, both amended counts alleged rape based only on other sexual conduct.

[22] During a recess just prior to closing arguments, the State brought this error to the court's attention. The State noted that this error was not caught by anyone; that both parties and the trial court had prepared for and openly discussed that there were two allegations of sexual conduct, oral sex and sexual intercourse;

---

[4] The original information for Counts 1 and 2 cited to Indiana Code Section 35-42-4-1(a)(1) and (b)(1), whereas the amended information corrected the latter cite to (b)(2) to indicate that Morales committed the crimes "while armed with a deadly weapon." Appellant's App. Vol. 2 at 21, 79.

and that both parties had consistently argued that both sexual acts occurred but disputed whether K.M. consented to the acts or was compelled by force or the imminent threat of force. The State requested to amend the information and to instruct the jury accordingly. The trial court denied the request, agreeing with defense counsel that the amendment was substantive and therefore untimely. Closing arguments followed, with both parties acknowledging that both sexual intercourse and oral sex occurred but disputing the element of force.

[23] After deliberations began, the jury sent a question asking, "Which count is oral? Which count is intercourse?" Tr. Vol. 7 at 7. The trial court then reversed its prior ruling and granted the State's request to amend the information and to revise and reread the jury instructions. The trial court stated,

> Given the fact that the jury is confused by this – and I can understand that, and given the fact that I am now realizing I believe that I made an error in classifying the modification or the amendment as substantive, I think [the amendment] is conforming the charge to meet the evidence as well as not allowing the Defense to necessarily benefit or take advantage of the mistake in that regard. That is causing [the jury] confusion. You guys have been on notice from day one … I mean, the evidence is there. It will help clarify things for the jury.

*Id.* at 11. Thereafter, the trial court revised the final jury instructions to reflect that Count 1 was rape alleging sexual intercourse and reread all of the jury instructions to the jury.

[24] "A charging information may be amended at various stages of a prosecution, depending on whether the amendment is to the form or to the substance of the

original information." *Erkins v. State*, 13 N.E.3d 400, 405 (Ind. 2014). Indiana Code Section 35-34-1-5(b) provides, in pertinent part, that "[t]he indictment or information may be amended in matters of substance ... before the commencement of trial; if the amendment does not prejudice the substantial rights of the defendant." Regarding amendments in form, subsection (c) provides that "[u]pon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the indictment or information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant." Ind. Code § 35-34-1-5(c).

[25]     "A defendant's substantial rights 'include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights.'" *Erkins*, 13 N.E.3d at 405 (quoting *Gomez v. State*, 907 N.E.2d 607, 611 (Ind. Ct. App. 2009), *trans. denied*). "'Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges.'" *Id*. at 405-06 (citation omitted). "We review a trial court's decision on whether to permit an amendment to a charging information for an abuse of discretion." *Hobbs v. State*, 160 N.E.3d 543, 551 (Ind. Ct. App. 2020), *trans. denied* (2021).

[26]     An amendment is one of form, not substance, "if a defense under the original information would be equally available after the amendment and the accused's evidence would apply equally to the information in either form. Further, an

amendment is one of substance only if it is essential to making a valid charge of the crime." *Erkins*, 13 N.E.3d at 406 (citation omitted). "Whether an amendment to a charging information is a matter of substance or form is a question of law." *Id.* "We review questions of law de novo." *Id.*

[27] Here, the State was required to establish the elements of rape as set forth by Indiana Code Section 35-42-4-1(a)(1), which provides that "a person who knowingly or intentionally has sexual intercourse with another person or knowingly or intentionally causes another person to perform or submit to other sexual conduct" when "the other person is compelled by force or imminent threat of force" commits rape. Both sexual intercourse and other sexual conduct are acts that can underlie a valid rape charge. Based on the probable cause affidavit, the original charging information, and the evidence available to both parties before, during, and at the conclusion of trial, it was no surprise to Morales that the State was alleging one act of sexual intercourse and one act of other sexual conduct. Therefore, the error in the amended charging information did not affect his ability to prepare his defense. As noted by the trial court, the evidence presented by both parties indicated that Morales engaged in two sexual acts with K.M., oral sex and sexual intercourse. The issue before the jury was not whether those sexual acts occurred, but whether those acts constituted rape, that is, whether K.M. was compelled by force or the imminent threat of force. The amendment of the information to clarify for the jury which count of rape was intended to apply to the oral sex and which count was intended to apply to the sexual intercourse in no way impaired Morales's defense and had

no effect on his ability to present evidence on the existence vel non of force. Thus, the amendment to the charging information was one of form, not substance, did not prejudice Morales's substantial rights, and was a reasonable response by the trial court to address the jury's confusion.[5] The trial court did not abuse its discretion in granting the State's motion to amend.

[28] As for the trial court's revision of the final instructions to provide the amended charging language, and its decision to reread to the jury all final instructions, Morales consented to this procedure. Accordingly, we need not review the trial court's decision in this regard.[6]

[29] Affirmed.

Bailey, J., and May, J., concur.

---

[5] Although Morales attempted to capitalize on the just-learned-of error during closing argument by suggesting that the sexual intercourse, forced or not, was not a crime charged by the State, *see* Tr. Vol. 6 at 216, this simply added to the jury's confusion as to why the original jury instructions and charges did not match the evidence and theories presented at trial.

[6] Defense counsel acknowledged that although he wished to preserve his objection to the trial court's decision to allow the amendment to the charging information, he consented to the subsequent curative procedures employed by the court.