Joshua J. NOLAN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 63A05–0607–CR–365.

Court of Appeals of Indiana.

March 29, 2007.

Steven E. Ripstra, Jasper, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Joshua J. Nolan appeals his convictions for Criminal Deviate Conduct, as a Class B felony, and Residential Entry, a Class D felony. Nolan raises three issues for our review, which we restate as:

1. Whether the State presented sufficient evidence for the jury to determine that the victim was unaware of his act.

2. Whether Nolan made a mistake of fact that the victim consented to his act.

3. Whether the victim's testimony was so inherently improbable as to require reversal on both convictions.

4. Whether the jury rendered inconsistent verdicts by acquitting Nolan of Rape while convicting him of criminal deviate conduct.

5. Whether the prosecuting attorney committed misconduct by calling Nolan's defense counsel as a witness.

We affirm.

### FACTS AND PROCEDURAL HISTORY

K.M. and her fiancé, A.M.,[1] had lived together for six years. A.M. and Nolan were friends of similar build and had similar haircuts. In the time K.M. and A.M. lived together, they engaged in sexual activity on a regular basis. Normally, A.M. would initiate sexual activity, which usually occurred in their bedroom at night. At night and with the lights off, the couples' bedroom was so dark one "could run into the bedpost." Transcript at 103. Sometimes A.M. would initiate sexual activity while K.M. was asleep, including by performing oral sex on K.M. K.M. was a heavy sleeper and difficult to wake up. A.M. also usually wore a particular brand of body spray, "Axe," with specific scents.

In the afternoon of June 29, 2005, A.M. left the couples' home. K.M., home alone, went to bed at 10:00 p.m., but, as was usual with A.M. and K.M., she left the

____

1. K.M. and A.M. subsequently married in September of 2005.

doors to the home unlocked. Nolan went to the home and, sometime after K.M. had gone to bed, Nolan entered the bedroom. K.M. heard someone enter the bedroom and assumed it was A.M., but at this point K.M. "was dreaming" and "halfway asleep." *Id.* at 112. Nolan was wearing Axe-brand body spray with the same scent as one of A.M.'s body sprays. Nolan stripped, got into bed with K.M., began touching her, then performed oral sex on her. After at least ten minutes of performing oral sex, Nolan engaged K.M. in sexual intercourse.

During the act of intercourse, K.M. realized something was not right, stopped the act, and reached to turn on the bedroom light. As the light came on, K.M. saw Nolan running from the bedroom. K.M. then had a "lucid moment," *id.* at 153, and she checked to see if A.M.'s vehicle was in the driveway "[t]o make sure [she] wasn't dream[ing]," *id.* at 115. After K.M. saw that A.M.'s vehicle was not there, she called a friend who could contact A.M. since A.M. did not have a cell phone that she could call directly. She then took a shower "to get [the 'dirty' feeling] off." *Id.* at 131. Shortly thereafter, A.M.'s brother arrived and called the police.

On July 1, 2005, the State charged Nolan with rape, as a Class B felony, and criminal deviate conduct, as a Class B felony. On February 15, 2006, the State amended the charging information to add Burglary, as a Class B felony, and residential entry, a Class D felony. During trial, defense counsel elicited witness testimony that the defense had requested DNA testing, which had not been completed in time for trial. On the prosecution's redirect of that witness, the prosecuting attorney inquired as to defense counsel's response to the testing not being completed in time for trial, to which the defense objected. Then, while in front of the jury, the State called

defense counsel as a witness, because the defense, according to the State, had provided the jury an "incomplete picture" of the defense's attempts at complete DNA analysis. *Id.* at 300. Again, the defense objected. The trial court called a sidebar, and afterwards the State and defense announced a stipulation on the issue as follows:

> [Prosecutor]: State does not believe that [defense counsel's] testimony is necessary since we have a stipulation. The parties received information from the Indiana State Police laboratory that it could not get the DNA analysis done in time for the trial scheduled for these dates and the parties agreed to go ahead and proceed to trial rather than continue the trial to give the State lab time to finish the DNA analysis.
>
> THE COURT: Okay. And the defendant so stipulates?
>
> MR. DOUGLAS S. WALTON [Defense counsel]: This has always been the case.

*Id.* at 307. Prior to the stipulated agreement, defense counsel made a request for a curative comment from the court informing the jury that he had not engaged in inappropriate conduct, which the court declined to make.

On April 18, the jury convicted Nolan of criminal deviate conduct and residential entry, but acquitted him on the charges of rape and burglary. On May 18, the trial court sentenced Nolan to ten years imprisonment, with nine years and 119 days suspended, on the criminal deviate conduct conviction. The trial court also sentenced Nolan to a concurrent one and one-half years imprisonment, with 401 days suspended, on the residential entry conviction. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Awareness

 Nolan first contends that the State did not present sufficient evidence to

support his conviction for criminal deviate conduct. When reviewing a claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jones v. State,* 783 N.E.2d 1132, 1139 (Ind.2003). We look only to the probative evidence supporting the verdict and the reasonable inferences that may be drawn from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.*

To prove criminal deviate conduct as charged, the State was required to show that Nolan "knowingly or intentionally cause[d] another person to . . . submit to deviate sexual conduct when[ ] . . . the other person [was] unaware that the conduct [was] occurring." Ind.Code § 35–42–4–2(a)(2) (2004). Oral sex is defined as "deviate sexual conduct" by statute. *See* I.C. § 35–41–1–9(1). And while "unaware" has not been defined by the legislature, we have held that " '[u]naware' is defined as 'not aware: lacking knowledge or acquaintance: UNCONSCIOUS.' " *Becker v. State,* 703 N.E.2d 696, 698 (Ind.Ct.App. 1998) (quoting Webster's 3d New Int'l Dictionary 2483 (1986 ed.)).

Circumstances in which we have found a victim to have been "unaware" include where the victim was asleep, as "a person is unconscious during sleep." *Id.* In addition, we found a female victim unaware when she had "lost consciousness due to inebriation." *Glover v. State,* 760 N.E.2d 1120, 1124 (Ind.Ct.App.2002) (adopting the *Becker* definition of "unaware" to the corresponding provision of the rape statute, I.C. § 35–42–4–1(a)(2)), *trans. denied.*

And our supreme court has suggested that a victim's illness and intoxication may lead to her being sufficiently "unaware" for the rape statute to apply, even if the victim never loses consciousness. *See Bryant v. State,* 644 N.E.2d 859, 860 n. 1 (Ind.1994).

Nolan contends that K.M. was not "unaware" under I.C. § 35–42–4–2(a)(2) because she was only "halfway asleep." Therefore, Nolan argues, she was not unconscious and she could not have been unaware of his act. But Nolan's position is not well-supported by Indiana law. Again, although the victims in *Becker* and *Glover* were unconscious, the victim in *Bryant* was not unconscious while she was being raped. *See Bryant,* 644 N.E.2d at 860; *Glover,* 760 N.E.2d at 1122–23; *Becker,* 703 N.E.2d at 698.

Further, the criminal deviate conduct statute as a whole supports the proposition that "unaware" is not equivalent to "unconscious" and that, instead, the legislature intended a broader definition. As we have stated:

> In reviewing a statute, we endeavor to determine [and] effect the intent of the legislature. We examine and interpret a statute as a whole, giving words their common and ordinary meaning and not overemphasiz[ing] strict, literal or selective readings of individual words. The legislative intent as ascertained from the whole prevails over the strict, literal meaning of any word or term used therein.

*Ind. Patient's Comp. Fund v. Anderson,* 661 N.E.2d 907, 909 (Ind.Ct.App.1996), *trans. denied.* Indiana Code § 35–42–4–2(a), in its entirety, states:[2]

---

2. The criminal deviate conduct statute is identical in its language to Indiana's rape statute, except that the rape statute proscribes "sexual intercourse with a member of the opposite sex" in lieu of "deviate sexual conduct." *See* I.C. § 35–42–4–1(a).

A person who knowingly or intentionally causes another person to perform or submit to deviate sexual conduct when:

(1) the other person is compelled by force or imminent threat of force;

(2) the other person is unaware that the conduct is occurring; or

(3) the other person is so mentally disabled or deficient that consent to the conduct cannot be given;

commits criminal deviate conduct, a Class B felony.

In light of the overall statutory language, we agree with the State that "the statute is concerned with consent in various situations." Appellee's Brief at 6. Specifically, clause (1) proscribes deviate sexual conduct on a person who cannot voluntarily consent to such conduct because he or she "is compelled by force or imminent threat of force." See I.C. § 35–42–4–2(a)(1). Clause (2) prohibits deviate sexual conduct on a person who is "unaware" of the conduct, presumably because one who is "unaware" cannot voluntarily consent to the conduct. I.C. § 35–42–4–2(a)(2). And clause (3) expressly proscribes such conduct on one that cannot consent when he or she is "mentally disabled or deficient." I.C. § 35–42–4–2(a)(3). Especially in light of clause (3), the unifying theme to the separate situations of proscribed conduct is that in none of those situations can a victim give voluntary consent to the act. Hence, our focus in addressing whether a victim was "unaware" involves looking at the facts favorable to the verdict to determine if the victim was capable of voluntarily giving consent to the actor.

■ Before proceeding further, we note that, "although lack of consent is not an element of rape or criminal deviate conduct per se, evidence which has a tendency to prove either consent or lack of consent is relevant to the element of compulsion,

which exists in both offenses [under clause (1) ]." *Tyson v. State,* 619 N.E.2d 276, 294 (Ind.Ct.App.1993), *trans. denied.* The same is true of the element of unawareness under clause (2). Although consent is not a per se element of that clause, evidence of consent is relevant to the purported victim's awareness. Similarly, lack of consent may be relevant to the purported victim's unawareness. And, as discussed below, a defendant may raise consent as an affirmative defense under the mistake of fact statute. *See* I.C. § 35–41–3–7.

Here, the facts support the jury's finding that K.M. was unaware of Nolan's act of deviate sexual conduct on her, even though K.M. was not fully asleep. K.M. repeatedly testified that she "was dreaming" and "halfway asleep" when Nolan entered the room and first engaged K.M. on her bed. Transcript at 112, 115, 152. K.M. further described her mental state at that time with a rhetorical question: "You ever been in a dream state where you're half awake and half asleep[?]" *Id.* at 152. The evidence also shows that K.M. gave no verbal or other consent to Nolan at any point, indicating a lack of awareness on her part as to the situation. However, despite the lack of express consent and K.M.'s dream-like mental state, Nolan began performing oral sex on K.M., which he did for "ten minutes at least." *Id.* at 329. Nolan cites no evidence to support the position that K.M. was fully aware at any point during those ten minutes. On those facts, we cannot say that K.M. was capable of voluntarily giving Nolan her consent. Therefore, the jury did not err finding her unaware during Nolan's act of oral sex.

**Issue Two: Consent**

■ Nolan also argues that he thought K.M. consented to his acts, and that if his belief as to her consent was reasonable, a

mistake of fact existed that precluded conviction. However, we have stated that:

> The law is well settled that if the court fails to cover some pertinent point [in instructing the jury] then it is the obligation of and duty of the party desiring to have that point covered in the instruction to tender his instruction on the same. Failure to so tender the instruction waives the right to object to that point not being covered.

*Anderson v. Taylor,* 154 Ind.App. 217, 289 N.E.2d 781, 785 (1972). Here, although Nolan stated during his testimony that he thought K.M. had given her consent, at no point did Nolan offer the trial court a jury instruction on the mistake-of-fact defense. As such, Nolan has waived this issue for appellate review.

Waiver notwithstanding, we cannot agree with Nolan's assertion that the evidence shows he made a reasonable mistake of fact as to whether K.M. consented to his act. Indiana Code Section 35-41-3-7 states: "It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for commission of the offense." And we have held that, "[i]n order for mistake of fact to be a valid defense, three elements must be satisfied: (1) the mistake must be honest and reasonable; (2) the mistake must be about a matter of fact; and (3) the mistake must negate the culpability required to commit the crime." *Giles v. State,* 699 N.E.2d 294, 300 (Ind.Ct. App.1998) (citing *Potter v. State,* 684 N.E.2d 1127, 1135 (Ind.1997)). Regarding the first element, our supreme court has stated that "[h]onesty is a subjective test dealing with what appellant actually believed. Reasonableness is an objective test inquiring what a reasonable man situated in similar circumstances would do. To require the giving of appellant's instruction, we must find some evidence of both." *Davis v. State,* 265 Ind. 476, 355 N.E.2d 836, 839 (1976).

Although Nolan testified that he believed K.M. consented, Nolan has failed to demonstrate that any mistake of fact he may have made was reasonable. Again, K.M. was in her bed, "halfway asleep," transcript at 112, and in a dream-like mental state when Nolan began his act of oral sex on her. And at no point during the act did K.M. expressly consent. On the other hand, Nolan waited until his friend, A.M., was not at home and his friend's fiancee was alone. The evidence shows that Nolan knew that the house would be unlocked, he knew that the bedroom would be completely dark, and he sprayed A.M.'s usual body spray on himself to give the impression, in that dark room, that he was another man. No reasonable person would believe that K.M. gave her consent to Nolan under those circumstances. Thus, even if Nolan had properly preserved his appeal of the mistake-of-fact defense, that defense would fail as a matter of law.

### Issue Three: K.M.'s Testimony

Third, Nolan argues that K.M.'s account of the facts is so inherently improbable as to require reversal of both of his convictions. Our supreme court recently described the doctrine of inherently improbable witness testimony as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Fajardo v. State,* 859 N.E.2d 1201, 1208 (Ind.2007).

Nolan's assertions on this issue fail to demonstrate that no reasonable person could believe K.M.'s testimony. Rather, Nolan's argument consists entirely of the following:

> That [K.M.] could carry on a sexual relationship with someone other than [A.M.], for 20 to 30 minutes, consisting of deeply sensuous touching and caresses, deriving pleasure from the event, while by definition being as physically close as is possible between human beings, and then only during or at the conclusion of intercourse realize something was amiss, is so novel a concept that Appellant's counsel found no similar case reported in Indiana. Then, instead of calling the police, or [A.M.], she calls her Brother and it is [A.M.'s Brother] who ends up calling the police.

Appellant's Brief at 12–13. But Nolan ignores K.M.'s testimony that she "was dreaming" during his act of deviate sexual conduct. *See* Transcript at 112. And K.M.'s actions following her discovery of a stranger in her bedroom are reasonably explained as a state of panic. Thus, we cannot say that K.M.'s testimony was so inherently improbable as to require a reversal of either of Nolan's convictions.

### Issue Four: Irreconcilable Verdicts

Fourth, Nolan contends that his conviction for criminal deviate conduct and acquittal for rape are "so irreconcilable as to warrant corrective action." Appellant's Brief at 1. We cannot agree. As the State correctly points out, the "differing verdicts may be explained by the jury's exercise of its power to assign weight to and either accept or reject certain pieces of evidence." Appellee's Brief at 10. *See Carmona v. State,* 827 N.E.2d 588, 594 (Ind. Ct.App.2005). And, as noted above, approximately ten minutes passed between Nolan's act of deviate sexual conduct and the act of intercourse. It was entirely within the jury's purview to consider whether K.M. became aware at the time Nolan engaged her in intercourse, thereby nullifying that element of the rape statute yet maintaining a conviction for criminal deviate conduct. *See* I.C. §§ 35-42-4-1(a), 35-42-4-2(a). As such, the conviction for criminal deviate conduct and acquittal for rape are not irreconcilable.

### Issue Five: Prosecutorial Misconduct

Finally, Nolan contends that the prosecutor committed misconduct in calling Nolan's trial counsel as a witness in front of the jury. In reviewing a claim of prosecutorial misconduct, we must go through a two part analysis. *Jenkins v. State,* 695 N.E.2d 158, 160 (Ind.Ct.App. 1998). We must determine: (1) whether the prosecutor committed misconduct, and (2) whether the misconduct, given the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Id.* (citing *Turnbow v. State,* 637 N.E.2d 1329, 1333 (Ind.Ct. App.1994), *trans. denied).* "The gravity of the peril is determined by considering the probable persuasive effect of the misconduct on the jury's decision, rather than the degree of the impropriety of the conduct." *Id.* (quoting *Robinson v. State,* 693 N.E.2d 548, 551 (Ind.1998)).

During trial, Nolan's counsel cross-examined State Trooper Brett Pool, the officer who responded to K.M.'s call to the police, on the issue of DNA evidence against Nolan. Specifically, Nolan's counsel asked:

> Q. Okay. Now let's talk about DNA. I don't think there's a question in anybody's min[d] as to whether Josh Nolan had sex with [K.M.], is there? That's not been a[t] issue today has it?

A. I don't believe it has, no.

* * *

Q. Matter of fact, didn't I on behalf of Josh Nolan request ... that the sheets, panties and so forth be processed for Josh's DNA testing?

A. Yes. You requested that.

* * *

Q. Josh showed up didn't he.

A. He did.

Q. Gave you the blood?

A. Yes he did.

Q. You took it to the lab.

A. Yes.

Q. Now it's my understanding Trooper that the lab was ... run [sic] in[to] some problems and they couldn't get everything processed in time for trial, is that correct?

A. That was [sic] the problems prior to this, yes.

Transcript at 271–73. Nolan's counsel then elicited Trooper Pool's testimony that Nolan had met with Trooper Pool outside of the presence of Nolan's counsel, but under the advice of his counsel, and offered Trooper Pool a blood sample. On redirect, the prosecutor engaged Trooper Pool as follows:

Q. Let's talk about this DNA. I'm not quite sure why [defense counsel] Mr. Walton's raising it, but we need to make sure we complete the picture here. Did you go to the hospital and meet with Mr. Nolan at the hospital in order to get the, the blood sample?

A. Yes I did.

* * *

Q. And Mr. Walton asked that the DNA be processed, correct?

A. Correct.

* * *

Q. [The DNA processing] didn't get done in time [for trial], did it?

A. No.

Q. No. And, and what was Mr. Walton's response when it didn't get done in time?

A. I don't know that I've seen a response from Mr. Walton in terms of it.

Q. Okay. Well in fact he said don't worry about it. We'll just go ahead and go. We won't ask for a continuance or anything like that. Isn't that right?

A. I would assume that since we're ...

MR. DOUGLAS S. WALTON: You're Honor ...

A .... at trial, yes.

MR. DOUGLAS S. WALTON: ... I object. He's asking for a question that ... calls for speculation....

MR. BOYD A. TOLER [Prosecutor]: That's fine, Judge. I'll call Doug Walton as a witness. He has left the impression with the jury that they've tried real hard to get a DNA sample because he is such a nice guy and he's trying to come forward, when clearly, Judge, that is not the case. He's leaving the jury with an incomplete picture. I'm trying to complete that picture. And if I have to call Mr. Walton as a witness to do it, I will do so.

*Id.* at 290–92.

After the trial court sustained the objection and both parties finished examining Trooper Pool, the State called Nolan's counsel as its next witness. The following exchange took place between the prosecutor and Nolan's defense counsel:

MR. DOUGLAS S. WALTON: I object, Your Honor. I'm defense counsel.

MR. BOYD A TOLER: He opened the door, Judge. He's leaving the jury with

an incomplete picture. I need to complete it. The only way I can do that is by putting Mr. Walton on the stand. I didn't do this. He did it to himself.

MR. DOUGLAS S. WALTON: I have nothing to hide, Your Honor, but the reality is I'm defense counsel. I have no reason to take the stand.

THE COURT: Okay. Gentlemen, let's have a sidebar on this matter.

MR. DOUGLAS S. WALTON: Thank you.

(Sidebar conference held.)

* * *

THE COURT: We're back on the record ... after a brief sidebar and uh, gentlemen do we have a stipulation at this time?

MR. DOUGLAS S. WALTON: Sure we do.

MR. BOYD A. TOLER: Yes, Judge. State does not believe that Mr. Walton's testimony is necessary since we have a stipulation. The stipulation is as follows: The parties received information from the Indiana State Police laboratory that it could not get the DNA analysis done in time for the trial scheduled for these dates and the parties agreed to go ahead and proceed to trial rather than continue the trial to give the State lab time to finish the DNA analysis.

THE COURT: Okay. And the defendant so stipulates?

MR. DOUGLAS S. WALTON: This has always been the case.

*Id.* at 300–07. During the sidebar conference, Nolan's counsel asked the court for a curative comment, which the court declined to make.

While we agree with Nolan that the prosecutor's conduct before the jury was highly inappropriate, we cannot agree that that inappropriate conduct placed Nolan

"in a position of grave peril." *See Jenkins,* 695 N.E.2d at 160. Nolan's sole argument on this part of the misconduct analysis is that the prosecutor's comments allowed the jury to draw a negative inference from Mr. Walton's refusal to testify. We cannot agree. Although the court did not make a curative comment, the prosecution and defense did reach a stipulation on the issue before the jury. In introducing that stipulation to the jury, the prosecutor explicitly stated that Mr. Walton's testimony was unnecessary. Hence, any persuasive effect of the prosecutor's acts on the jury's decision was overcome by the prosecutor's express statement that the testimony of the defense counsel was unnecessary. *See, e.g., Chubb v. State,* 640 N.E.2d 44, 48–49 (Ind.1994).

**Conclusion**

We affirm Nolan's convictions. There is sufficient evidence to support the jury's conclusion that K.M. was "unaware" of Nolan's act of deviate sexual conduct upon her. Although Nolan has waived his appeal of a mistake-of-fact defense, no such defense could have properly been offered on the issue of K.M.'s consent. K.M.'s testimony also was not so inherently improbable as to require reversal, nor were the jury's verdicts on the rape and criminal deviate conduct counts inconsistent. Finally, although the prosecutor's call of Nolan's defense counsel to the witness stand was highly inappropriate, the prosecutor's subsequent statement to the jury that opposing counsel's testimony was unnecessary overcame any misconduct.

Affirmed.

MAY, J., and MATHIAS, J., concur.