## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 20 2017, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Supervising Officer Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Latham E. Small,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 20, 2017<br><br>Court of Appeals Case No.<br>02A05-1704-CR-926<br><br>Appeal from the<br>Allen Superior Court<br><br>The Honorable<br>John F. Surbeck, Jr., Judge<br><br>Trial Court Cause No.<br>02D04-1604-F3-27 |

**Kirsch, Judge.**

[1] Following a jury trial, Latham E. Small ("Small") was convicted of two counts of Level 3 felony rape,[1] one count of Class A misdemeanor battery resulting in bodily injury,[2] and one count of Class B misdemeanor furnishing alcohol to a minor.[3] He appeals his two rape convictions and raises the following restated issues:

> I. Whether one of the two convictions for Level 3 felony rape must be vacated because they were based on the same act and violate Indiana's prohibition against double jeopardy; and

> II. Whether the evidence is sufficient to sustain either of Small's two convictions for Level 3 felony rape.

[2] We affirm in part, vacate in part, and remand with instructions.

## Facts and Procedural History

[3] Small and H.S. married in May 2015, and they lived with H.S.'s parents. In October 2015, H.S.'s nineteen-year-old sister, H.D., also moved into the residence. On the evening of October 21, 2015, Small, H.S., H.D., and their mother, K.D., had dinner together at the home, and, after dinner, the four of them had a bonfire in the fire pit on the backyard patio.[4] Small and K.D. had two or three alcoholic drinks, but sisters H.S. and H.D. did not have any.

---

[1] *See* Ind. Code § 35-42-4-1(a)(2).

[2] *See* Ind. Code § 35-42-2-1(c)(1).

[3] *See* Ind. Code § 7.1-5-7-8(a)(1).

[4] K.D.'s husband, who was also the father of H.S. and H.D., was a firefighter and was on duty at the time.

Around 9:00 p.m., H.S. and K.D., went inside and went to bed, leaving Small and H.D. outside. Small suggested that H.D. finish her mother's drink, but H.D. declined. Small went in the house and came back out with two shots of alcohol, offering one to H.D. She drank the shot, and as the night continued, Small kept offering shots to H.D., who drank them and became increasingly intoxicated. At one point, Small went in the house, and when he came back outside, he slid his hand down H.D.'s shirt and rubbed her breast. She told him not to do that again, because "it wasn't right, and he was married to my sister." *Tr. Vol. I* at 216.

[4] Small sat back down, and the two continued to talk. H.D. "start[ed] to not remember things" around that point in the night. *Id.* Her next recollection was finding herself "out in the middle of the lawn and [Small] was trying to shove his penis in my face." *Id.* H.D. "blacked out [] again for a while," but then woke to find her pajama pants down around her knees, and she saw Small walking into the house. *Id.* at 217. She got up, felt "really dizzy" and "really nauseous," and went back into the house, headed toward her bedroom. *Id.* In the hallway, H.D. encountered her sister, H.S., who asked H.D., "what's going on, are you okay," but H.D. did not say anything to her. *Id.* at 218; *Tr. Vol. II* at 192. Concerned that H.D. had been drinking, H.S. woke their mother, K.D., for assistance. K.D. and H.S. comforted H.D., who was crying and threw up, and they heard H.D. make references to "bad Latham" and "that is my sister." *Tr. Vol II* at 35.

[5] H.S. went to another room and confronted Small to find out what he had done to H.D. Initially, Small denied doing anything, but later stated, "All I tried to do was kiss her." *Id.* at 35, 213. A physical altercation ensued between Small and K.D., and H.S. called 911. Officer Nicholas Keefer (Officer Keefer") of the Allen County Sheriff's Department[5] responded to the domestic battery dispatch call at around 12:05 a.m. and was the first to arrive; other law enforcement and emergency personnel came to the scene, too. Officer Keefer encountered K.D. in the garage and spoke to her. He also spoke to Small, who yelled to Officer Keefer, "[I]t's me, I'm the one you're looking for." *Id.* at 61.

[6] As Officer Keefer spoke to Small, he heard a scream from a back bedroom. Officer Jason Schmieman ("Officer Schmieman") went to the room and found H.D. in bed, and fresh vomit on the floor. H.D. was crying and appeared to be "very intoxicated." *Id.* at 85. Officer Schmieman tried to talk to H.D. and ask her what happened. She said she did not know "[a]nd then seconds later she said she might have been raped but she did not remember." *Id.* at 86. Officer Keefer learned from H.D. that "bad things happened," but could not get detail from H.D. *Id.* at 66. Officer Keefer eventually learned from H.D. that Small had touched her breast and tried to remove her pants, but H.D. did not know if he had sexual intercourse with her because she had blacked out. *Id.* at 68-69.

---

[5] We note that some law enforcement individuals who testified referred to their employer as the Allen County Sheriff's Department, while others identified it as the Allen County Police Department, *see tr. vol. II* at 57, 83, 88, 144, but they generally refer to each other as "officers," not deputies, *see id.* at 59, 64, 65, 84, and we will do the same in this decision.

EMTs also came into H.D.'s room and tried to treat her, but she screamed whenever they tried to get near her.

[7] Because law enforcement suspected a possible rape had occurred, they contacted sexual assault nurse examiner Shawn Callahan ("Callahan") by phone. Callahan heard the commotion of H.D. on the phone and, believing H.D. was "basically incoherent," Callahan told police she could not accept H.D. as a patient until she sobered up because the exam required consent and based on what she was hearing, she did not believe H.D. had the capacity to consent to the exam. *Id.* at 113. The next morning, H.D.'s father took H.D. to the sexual assault treatment center to be examined by Callahan, who conducted a full body exam and took swab samples from H.D.'s breast, external and internal vagina, anal folds, perineum, vaginal wash, bilateral inner thighs, and buttocks. *Id.* at 124. She also collected H.D.'s pajama pants. The swabs and pants were sent to the Indiana State Police ("ISP") crime laboratory for testing.

[8] In April 2016, the State charged Small with three counts of Level 3 felony rape, alleging rape by force or imminent threat of force, rape when H.D. was unaware that sexual intercourse was occurring, and rape when H.D. was so mentally disabled or deficient that she could not give consent to sexual intercourse. *Appellant's App. Vol. II* at 15, 17, 19. The State also charged Small with one count of Class A misdemeanor battery. *Id.* at 21. In August 2016, the State filed an amended charging information to add a fifth count, Class B misdemeanor furnishing alcohol to a minor. *Id.* at 23, 32-34.

[9] At the two-day February 2017 jury trial, the State presented the testimony of a number of witnesses, including H.D., H.S., and K.D., as well as Callahan, various law enforcement and emergency responders, and a forensic analyst from the ISP crime lab. In her testimony, H.D. recalled that she had approximately eight shots of vodka, Jagermeister, or whiskey. *Tr. Vol. I* at 227. H.D. remembered telling Small not to touch her breast again, but then she began to not remember things. Her next recollection was of being in the yard on her back with Small trying to "shove" his penis in her face. *Id*. at 216. She recalled that her clothes were still on at that time. She "blacked out" again and woke to find her pants at her knees, and Small was walking back into the house. *Id*. at 217. H.D. made her way to her bedroom and described that she was "scared" and was crying. *Id*. at 218. H.D. heard her mother yelling in the living room, and "there were two cops at my door" and later "EMTs and Firefighters and Cops all in the room with me[,] looking at me." *Id*. at 219. H.D. said that she vomited "everywhere, on the floor, on my bed, on myself." *Id*. at 220. She recalled them asking her questions, but explained that she "wasn't able" to answer and, instead, kept repeating phrases such as "I'm sorry[,]" "She's my sister[,]" and "I kept telling him no." *Id*. at 239, 244. On direct examination, counsel for the State asked H.D., "[A]t any point that night did you consent or agree to have sex with the Defendant?" and she replied, "No." *Id*. at 228. On cross-examination, H.D. affirmed that she did not remember how she got out to the yard and that it is possible that she went there willingly. *Id*. at 238. After agreeing that she did not recall having intercourse,

defense counsel asked, "So you don't recall whether or not you consented either, correct?" and H.D. replied, "Correct." *Id.* at 237.

[10] H.S. testified that she left the bonfire and went to bed early, but was awakened when Small got into bed. At her request, he moved to the living room to sleep, and she brought blankets and a fan to him. As H.S. was returning to bed, she encountered H.D. in the hallway and noticed that H.D. was stumbling. H.S. tried to speak to H.D. by saying her name, but H.D. "just walked right past [her]." *Tr. Vol. II* at 192. H.S. reached out to grab H.D.'s arm, but H.S. described that H.D. "walked right by me like I wasn't even there," "kind of stumbled into the wall," and went into her room. *Id.* at 193. H.S. followed H.D. into her bedroom and asked if she had been drinking, but H.S. stated that H.D. "couldn't really respond . . . it was mostly just like mumbles and moans, it wasn't really sentences." *Id.* at 194. H.S. then went into K.D.'s room and woke her up to help H.D., who H.S. described as being "extremely impaired." *Id.* at 210. K.D. and H.S. went to H.D.'s room, and H.D. vomited on the floor and began crying. H.S. went to the living room to talk to Small, and when she went back into H.D.'s room, she heard H.D. keep saying "bad Latham." *Id.* at 195, 211. H.S. described that K.D. thereafter confronted Small, who got angry, and H.S. tried to calm him, but could not, so she called 911.

[11] H.D.'s mother, K.D., testified that H.D. was "out of it" when she and H.S. went into H.D.'s room, but that H.D. was repeating the phrases "bad Latham" and "that is my sister." *Id.* at 34-35. After hearing this, K.D. and H.S. went into the living room and confronted Small, who initially denied that anything

happened, but eventually said "all I tried to do was kiss her." *Id.* at 35. Small told K.D., "I didn't do anything to your daughter," and, thereafter, a physical altercation ensued between K.D. and Small, during which Small grabbed K.D. and shoved her against the fireplace. H.S. called 911, and K.D. described that she "went hysterical," called her husband, and sat in a car in the garage. *Id.* at 37.

[12] Officer Keefer encountered a "hysterical" K.D. in the garage when he arrived. *Id.* at 59. Officer Keefer saw Small and spoke to him. Small told Officer Keefer that he and H.D. drank alcohol out in the backyard and that "at one point he tried to kiss her, and she said no, and that was the end of it." *Id.* at 63. During this time, Officer Keefer heard a "chilling scream" from the back bedroom and sent Officer Schmieman to see what was going on. Officer Schmieman reported back to Officer Keefer, and based on what was said, Officer Keefer contacted a detective for a rape investigation. Officer Keefer then went to the bedroom and found H.D. under the covers and crying, and he saw vomit on the floor. When he tried to get information from H.D., "the only thing I could get out of her was that she said bad things happened." *Id.* at 66. He left the room, but came back after medical personnel had worked with her, and Officer Keefer stated that H.D. told him that Small grabbed her breast and he tackled her to the ground and began trying to remove her pants and "after that she said she kind of blacked out and could not remember anymore." *Id.* at 68. She told Officer Keefer that she did not know if they had sexual intercourse. *Id.* at 69, 71.

[13]   Officer Schmieman testified that when he attempted to talk to H.D. and ask her questions about the night, she at first could not provide any information as to what happened to her, but then stated that she told him that she may have been raped. *Id.* at 85-86.

[14]   Captain Jacob Knudson and firefighter and medic Chris Wolf ("Wolf") of the Huntertown Fire Department testified that H.D. appeared intoxicated and "wasn't making sense," and they had a difficult time assessing her because she was "screaming and repeating herself," appeared very scared, and would not let them get near her to check her vitals such as blood pressure or pulse. *Id.* at 9-10, 20-21. Wolf testified that H.D. repeated several times, "[H]e just kept giving me drinks" and "I'm sorry, I'm sorry he raped me." *Id.* at 21-22, 26. When asked if she was able to answer them coherently, Wolf replied, "No." *Id.* at 22. Wolf believed H.D. should be transported to the hospital for at least observation, but H.D.'s father, who was also a medic, arrived home, so they agreed not to transport her.

[15]   Lori James ("James"), a forensic DNA analyst for ISP, testified to her findings from her testing the swabs and pajama pants. According to James, a sperm fraction profile developed from H.D.'s vaginal wash was consistent with Small and had a statistical weight of one in 8 trillion unrelated individuals. *Id.* at 168-69; *State's Ex.* 25. Additionally, James tested H.D.'s vaginal/cervical swabs, anal swabs, external genital swabs, perineum swabs, internal genital swabs, bilateral buttocks swabs, bilateral inner thigh swabs, and H.D.'s pajama pants. James's determined that serological testing showed the possible presence of

seminal material consistent with Small with a statistical weight of one in 8 trillion unrelated individuals. *Id*. at 165-81; *State's Ex*. 25. Furthermore, the nonsperm fraction of these swabs was consistent with a mixture of two individuals, and after assuming that H.D. was a contributor, the remainder was consistent with the DNA profile of Small. *Id*.

[16] The jury found Small guilty of: (1) Count II, rape by knowingly or intentionally having intercourse with H.D. when H.D. was unaware that sexual intercourse was occurring; (2) Count III, rape by knowingly or intentionally having sexual intercourse with H.D. when she was so mentally disabled or deficient that she could not give consent; (3) Count IV, battery, and (4) Count V, furnishing alcohol to a minor.[6] The trial court sentenced Small to twelve years in the Department of Correction for each of the rape convictions, with three years suspended to probation, one year for the battery conviction, and sixty days for furnishing alcohol to a minor. The trial court ordered that the two rape convictions and the conviction for furnishing alcohol to a minor be served concurrent with each other, but consecutive to the one-year battery conviction, for an aggregate sentence of thirteen years. *Tr. Sent. Vol.* at 32-33; *Appellant's App. Vol. II* at 128-29. In deciding not to impose consecutive sentences for the two rape convictions, the trial court stated:

---

[6] The jury found Small not guilty of Count I, rape by force or imminent threat of force. *Tr. Vol. III* at 32; *Appellant's App. Vol. II* at 95.

I would first note that Count 2, Rape, a Level 3 felony; and Count 3, Rape, a level 3 felony are – there is one act, a single act, although defined separately, and so it is certainly not appropriate to impose consecutive sentences. I even have some concerns about merging, although I will leave that to others to make that decision.

*Tr. Sent. Vol.* at 30. Small now appeals.

# Discussion and Decision

## I. Double Jeopardy

Article 1 Section 14 of the Indiana Constitution provides in relevant part: "No person shall be put in jeopardy twice for the same offense." Our Supreme Court has explained that "two and or more offenses are the 'same offense' in violation of Article 1, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original). When using the actual evidence test to determine if there is a double jeopardy violation, a defendant "must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id*. at 53.

Small contends, and the State concedes, that one of the two rape convictions must be vacated because the two convictions were based on the same actual

evidence, namely a single act of intercourse. We agree that the convictions violated Indiana's actual evidence test and that one of the two convictions must be vacated. *See Gale v. State*, 882 N.E.2d 808, 820 (Ind. Ct. App. 2008) (*sua sponte* vacating one of defendant's two convictions for rape, which were based on one act of sexual intercourse, because trial court's merger after judgment of conviction did not cure double jeopardy violation). We now turn to Small's two rape convictions to determine if the evidence is sufficient to sustain either of them.

## II. Sufficiency

[19]  Small contends that the evidence was not sufficient to convict him of either of the two counts of rape. In reviewing a claim of insufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *Gale*, 882 N.E.2d at 816-17; *Glover v. State*, 760 N.E.2d 1120, 1124 (Ind. Ct. App. 2002), *trans. denied*. Rather, we examine only the evidence most favorable to the State, along with all reasonable inferences to be drawn therefrom. *Glover*, 760 N.E.2d at 1124. If there is substantial evidence of probative value from which a jury could find guilt beyond a reasonable doubt, we will affirm. *Id.* at 1124-25. The evidence need not be so overwhelming as to overcome every reasonable hypothesis of innocence. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). Circumstantial evidence alone may be sufficient to support a rape conviction. *Jones v. State,* 780 N.E.2d 373, 376 (Ind. 2002). Further, the uncorroborated testimony of the victim may be sufficient to sustain a conviction. *Birari v. State*, 968 N.E.2d 827, 832 (Ind. Ct. App. 2012), *trans. denied*.

[20] To convict Small as charged in Count II, the State was required to prove that he knowingly or intentionally had intercourse with H.D. while H.D. was unaware that sexual intercourse was occurring. *Appellant's App. Vol. II* at 17; Ind. Code § 35-42-4-1(a)(2). To convict Small as to Count III, the State was required to prove that H.D. was so mentally disabled or deficient that she could not give her consent. *Appellant's App. Vol. II* at 19; Ind. Code § 35-42-4-1(a)(3). We first address Small's sufficiency argument as to Count II, in which Small contends that the State presented insufficient evidence that H.D. was unaware that intercourse was occurring.

[21] Although our legislature has not defined the term "unaware," we have held that "unaware" means "not aware: lacking knowledge or acquaintance; Unconscious." *Glover*, 760 N.E.2d at 1124 (discussing criminal deviate conduct case of *Becker v. State*, 703 N.E.2d 696, 698 (Ind. Ct. App. 1998) and adopting *Becker* definition of "unaware" to corresponding provision of rape statute); *see also Bell v. State*, 29 N.E.3d 137, 142 n.2 (Ind. Ct. App. 2015) (recognizing *Glover* court's adoption of definition), *trans. denied*. The *Glover* court stated that the language of the rape statute was adequate to inform a person of ordinary intelligence that "sexual intercourse with an individual who has lost consciousness due to inebriation is proscribed." 760 N.E.2d at 1124. However, this court has clarified that "[t]he victim does not need to be unconscious for the sexual intercourse to constitute rape. Instead, . . . Indiana Code section 35-42-4-1(a)(2) 'requires the victim be 'unaware' that the sexual act is occurring.'" *Filice v. State*, 886 N.E.2d 24, 36 (Ind. Ct. App. 2008), *trans. denied*. "[O]ur

focus in addressing whether a victim was "unaware" involves looking to the facts to determine whether the victim was capable of voluntarily giving consent to the actor." *Nolan v. State,* 863 N.E.2d 398, 403 (Ind. Ct. App. 2007), *trans. denied* (addressing unawareness clause of criminal deviate conduct statute, Indiana Code section 35-42-4-2(a)(2)).[7]

[22] On appeal, Small does not dispute that the DNA evidence established that he and H.D. had sexual intercourse. *Appellant's Br.* at 11 (acknowledging that "H.D. and Small apparently had sex, which was established by DNA evidence[.]"). Small's challenge to the evidence is that the State presented no evidence of H.D.'s condition at the time of the intercourse, noting that there was no evidence that H.D. was administered a breathalyzer test or that her blood alcohol concentration was measured at or around the time of the incident. He argues, "[T]here was no evidence that H.D. was physically incapacitated at the time the sex occurred, was unconscious, or was otherwise unresponsive. Rather, there was only evidence that she could not recall having sex or consenting to sex with her brother-in-law." *Id.* at 12. We disagree with Small's characterization of the evidence and the conclusion that he argues must be drawn from it.

---

[7] We explained, "Although consent is not a per se element of [Indiana Code section 35-42-4-2(a)(2)], evidence of consent is relevant to the purported victim's awareness. Similarly, lack of consent may be relevant to the purported victim's unawareness." *Nolan v. State*, 863 N.E.2d 398, 403 (Ind. Ct. App. 2007), *trans. denied*.

[23] Here, H.D. testified that she drank eight shots of alcohol and that, at some point after Small touched her breast and she told him not to do it again, she could not remember what exactly happened, but found herself on her back in the yard and saw Small putting his penis in her face. H.D. said that she "blacked out [] again" and did not remember what happened after that, until she woke to find her pants pulled down to her knees, and she saw Small walking into the house. *Tr. Vol. I* at 217. When H.D. made her way back into the house, she said she was dizzy and felt nauseous. She stumbled past, but did not respond to, H.S. who tried to talk to H.D. and tried to grab H.D.'s arm. H.D. threw up, was crying, and law enforcement and emergency personnel could not communicate with H.D. because she was distraught, hysterical, and incoherent, although she did repeat phrases such as "bad Latham." *Tr. Vol. II* at 34-35, 195, 211. H.D. stated that she was not sure whether intercourse had occurred, but told Officer Keefer that she believed that it had. *Id.* at 69. We find that the State presented evidence that permitted the jury to infer that H.D. was unaware that the act of intercourse was occurring. *See Gale*, 882 N.E.2d at 813, 818 (evidence sufficient where victim was intoxicated, had a .308 blood alcohol level, and did not remember anything other than "being outside at the bar in the parking lot with police cars around, throwing up, crying and screaming that he raped me").

[24] Small's argument that there was no evidence presented of her condition at the exact time of intercourse is, more precisely, a claim that there is no *direct evidence* of her condition at the time, and it "ignores the substantial amount of

circumstantial evidence that [the victim] was unconscious during the sexual intercourse." *Id.* at 817-18. Small's suggestion that H.D. may have been aware and may have consented is a request for us to reweigh evidence, which we cannot do. *See Filice*, 886 N.E.2d at 36 (defendant's argument that victim, who had consumed date rape drug that causes one to experience lucid and non-lucid states, may have been lucid and aware at time of sexual encounter was request to reweigh evidence, where victim remembered only "snap[shots or] flashbacks," including of defendant putting his penis in her mouth, and evidence showed that victim was impaired throughout evening and was observed before encounter with defendant as being "unresponsive," "limp," and not "present").

[25] Small contends that "H.D.'s intoxication and inability to remember does not equate to her being unaware or unconscious during sex." *Reply Br.* at 4. However, the issue is not whether one equates to, or is the equivalent of, the other. Rather, the question is whether the State presented sufficient evidence, including testimony of the victim and others concerning her actions before and after the sex occurred, from which a reasonable jury could infer that H.D. was not aware at the time that intercourse was occurring. Indeed, we look only to the probative evidence supporting the verdict and the reasonable inferences that may be drawn from that evidence to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Nolan*, 863 N.E.2d at 402 (facts supported jury's finding that victim was unaware of defendant's act of sexual deviate conduct where victim testified that

she "was dreaming" and "halfway asleep" when she woke to find defendant's penis against her vagina). In this case, we find that the State presented sufficient evidence of probative value from which a reasonable jury could have found that H.D. was unaware of the sexual intercourse as it was occurring.

Here, the evidence was sufficient to convict Small of the act alleged in Count II. Having already determined it necessary to vacate one of the two rape convictions, we need not reach the issue of whether the evidence was also sufficient to convict Small of Count III. Thus, we affirm the conviction on Count II, we vacate the conviction on Count III, and remand to the trial court with instructions to amend its order.

Affirmed in part, vacated in part, and remanded with instructions.

Najam, J., and Brown, J., concur.